**In the Interest of A.D.,
a Minor (at 1842).**

**Appeal of D.R.D., II, Appellant.**

**In the Interest of C.D., a Minor
Child (at 1843).**

**Appeal of D.R.D., II, Father, Appellant.**

**In the Interest of K.R.D.,
a Minor (at 1844).**

**Appeal of D.R.D., II, Father, Appellant.**

Superior Court of Pennsylvania.

Submitted Feb. 18, 2014.

Filed June 9, 2014.

Ann M. Rotz, Hagerstown, MD, for appellant.

Brian C. Bornman, Chambersburg, for appellee.

Kristen B. Hamilton, Chambersburg, for Guardian Ad Litem, appellee.

Jeffrey B. Engle, Harrisburg, for J.M.D., appellee.

BEFORE: BOWES, OLSON, and FITZGERALD,* JJ.

OPINION BY BOWES, J.:

D.R.D., II ("Father") appeals from the order entered on September 19, 2013, wherein the orphans' court involuntarily terminated his parental rights to his three minor children, K.R.D., A.D., and C.D. We affirm.

On December 13, 2011, Franklin County Children and Youth Services ("CYS" or "Agency") placed K.R.D., A.D., and C.D. in its legal and physical custody after it received information that J.M.D. ("Mother") and Father had relocated with the children from Texas to Franklin County, Pennsylvania, in violation of an active safety plan drafted by a social service agency in Texas. Among other things, the Texas safety plan prohibited Father from contacting the children due to allegations that he sexually abused A.D. and a finding by the Texas agency of "reasons to believe," the evidentiary equivalent of the preponderance of the evidence, that the abuse occurred. On January 19, 2012, the juvenile court adjudicated K.R.D., A.D., and C.D. dependent. The initial permanency goal was reunification. Despite the court's finding of aggravated circumstances as to both parties, it directed the agency to establish reunification services for Mother. However, due to pending criminal charges in Texas and a no-contact order, the trial court relieved CYS from an obligation to provide Father reunification services. Father was incarcerated in Pennsylvania briefly and eventually returned to Texas where he awaits trial for his sexual abuse of A.D. The three children, K.R.D., A.D., and C.D., currently reside together in a pre-adoptive foster home. At the time of the termination proceedings, the respective ages of K.R.D., A.D., and C.D. were eight, seven, and two years old.

Father contacts CYS about the children approximately three to four times a month. Pursuant to the no-contact order, he is prohibited from sending the children gifts. Since November 2012, Father has provided the children with medical insurance.

* Former Justice specially assigned to the Superior Court.

On June 18, 2013, CYS filed a petition to terminate Mother's and Father's parental rights and to change the permanency goal for K.R.D., A.D., and C.D. from reunification to adoption. During the ensuing hearings, CYS presented testimony from the caseworker assigned to the family, two psychologists, the children's therapist, and the foster parents. K.R.D. and A.D. also testified *in camera*.[1] As it related to this appeal, the foster parents testified that while K.R.D. and A.D. have been in their home, they have both disclosed additional incidents of sexual abuse perpetrated against them by Father while the family lived in Texas. The foster parents also testified that the two children indicated that they informed Mother about the additional incidents and said that she failed to stop the abuse. At the close of CYS's case-in-chief on July 29, 2013, the trial court convened a hearing in chambers to (1) determine the propriety of terminating only one parent's parental rights and (2) discuss the *sua sponte* dismissal, in the nature of a compulsory nonsuit, of CYS's petition against Mother. During the conference, the trial court concluded that the evidence CYS adduced during its case-in-chief to support terminating Mother's parental rights was insufficient to proceed. Therefore, the court announced its intention to dismiss that petition and, accordingly, it immediately entered an order that formally dismissed CYS's petition to terminate Mother's parental rights. In reference to Mother's putative testimony concerning the yet unresolved permanency and goal change issues, the trial court advised Mother's counsel, "the worst thing

[he] could do is put [Mother] on the stand and say that this [additional abuse] did not happen."[2] N.T., 8/2/13, at 13.

Thereafter, the court adjourned until August 2, 2013, when it reconvened the hearing regarding the termination of Father's parental rights and the goal change proceedings as to both parents. In the interim, Father, CYS, and the guardian *ad litem* filed petitions requesting that the trial court recuse from the ensuing termination and permanency proceedings. The trial court denied Father's and CYS's motions by orders entered on August 1, 2013, and it denied the guardian *ad litem's* motion in open court the following day. *Id.* at 8.

During the August 2, 2013 hearing on the petition for termination of Father's parental rights, Father declined to present any evidence in defense of his position that his parental rights should not be terminated under § 2511(a) and (b). He declined to call Mother or the maternal grandmother to testify on his behalf, explaining that he believed "any evidence offered by them ... likely would have been tainted by the Court's [statements]." *Id.* at 16. However, the guardian *ad litem* called Mother as a witness. After receiving additional evidence regarding the children's permanency goal, the trial court entered a decree on September 19, 2013, that terminated Father's parental rights pursuant to 23 Pa. C.S. § 2511(a) and (b). This timely filed appeal followed.[3]

Father complied with Pa.R.A.P. (a)(2)(i) and filed a Rule 1925(b) statement assert-

---

1. While the children testified in the court room, Mother was excluded.

2. The in-chambers conference was not recorded. However, the trial court took judicial notice of its statement during a subsequent record proceeding. *See* N.T., 8/2/13, at 13.

3. Additionally, the trial court denied CYS's petition to change the children's permanency goal to adoption and directed CYS to prepare Mother and the children for reunification. We address the appeals from that order in a separate adjudication.

ing two issues, which he reiterates on appeal as follows:

1. Whether the trial court's decision to terminate Father's parental rights was supported by clear and convincing evidence and did not constitute an abuse of discretion[.]

2. Whether the trial court's denial of [Father's] [m]otion to [r]ecuse did not constitute an abuse of discretion[.]

Fathers brief at 4–5. For judicial convenience, we address the latter issue at the outset.[4]

■ The denial of a motion to recuse is preserved as an assignment of error that can be raised on appeal following the conclusion of the case. *Reilly by Reilly v. Southeastern Pennsylvania Transp. Authority*, 507 Pa. 204, 489 A.2d 1291, 1300 (1985). We review a trial court's decision to deny a motion to recuse for an abuse of discretion. *Vargo v. Schwartz*, 940 A.2d 459, 471 (Pa.Super.2007). Indeed, our review of a trial court's denial of a motion to recuse is exceptionally deferential. *Id.* ("[W]e extend extreme deference to a trial court's decision not to recuse[.]"). As we explained in *Commonwealth v. Harris*, 979 A.2d 387, 391–392 (Pa.Super.2009) (quoting in part *Commonwealth v. Bonds*, 890 A.2d 414, 418 (Pa.Super.2005)), "We recognize that our trial judges are 'honorable, fair and competent,' and although we employ an abuse of discretion standard, we do so recognizing that the judge himself is best qualified to gauge his ability to preside impartially." Hence, a trial judge should grant the motion to recuse only if a doubt exists as to his or her ability to preside impartially or if impartiality can be reasonably questioned. *In re Bridgeport Fire Litigation*, 5 A.3d 1250, 1254 (Pa.Super.2010).

■ In order to prevail, Father, as the party seeking recusal, must satisfy the burden "to produce evidence establishing bias, prejudice or unfairness which raises a substantial doubt as to the jurist's ability to preside impartially." *In re S.H.*, 879 A.2d 802, 808 (Pa.Super.2005) (quoting *Arnold v. Arnold*, 847 A.2d 674, 680–81 (Pa.Super.2004)). Herein, Father failed to satisfy his burden of production.

■ As it is leveled in his brief, Father's argument is predicated upon the trial court's indication during the in-chambers hearing that "good evidence" existed that he systematically abused the children. He also insinuates that the trial court announced its decision to terminate Father's parental rights before he had an opportunity to present his case. Finally, Father complains that the trial court's comment regarding the wisdom of Mother's proposed testimony denying the allegations that other abuse occurred was "likely to influence any testimony from Mother, who[m] (sic) [Father] expected to testify immediately after this in chambers confer-

---

4. CYS and the guardian *ad litem* both argue that, while the evidence adduced during the hearings overwhelmingly supported the trial court's decision to terminate Father's parental rights, the court erred in denying the motion to recuse. This view is consistent with CYS's and the guardian *ad litem's* primary assertions in the consolidated appeals from the respective orders dismissing CYS's petition to terminate Mother's parental rights and denying the agency's request to change the children's permanency goal to adoption. In both of those appeals, CYS and the guardian *ad litem* contend the court erred in refusing to recuse and they request that we vacate the respective orders and remand for new proceedings before a new trial court. Hence, their position herein relative to Father's appeal is a self-serving reflection of the viewpoint that they advance in their appeals with respect to Mother. As we find that the trial court did not abuse its discretion in denying Father's motion to recuse, the arguments leveled by CYS and the guardian *ad litem* herein are unconvincing.

ence." Father's brief at 23. For the following reasons, all of these arguments failed to establish any bias, prejudice, or unfairness that would raise a substantial doubt as to the trial court's ability to preside impartially.

In denying Father's motion to recuse, the trial court explained that, while it advised Father's counsel that "good evidence" existed to establish that the children were "systematically abused," it did not render a judgment on the petition but simply found that, unlike in Mother's case, CYS adduced sufficient evidence to survive a nonsuit. Specifically, before hearing any additional evidence following the agency's case-in-chief, the trial court explained:

At the close of the Agency's case, this Court was well within the bounds of judicial ethics and propriety to inform counsel for the parties that the Agency had not produced sufficient evidence in support of its Petition for the involuntary termination of the parental rights of [Mother] in order for the case to proceed. While doing so, the Court advised counsel for the parties that sufficient evidence does exist in the record for the case against [Father] to continue. The Court engaged counsel in discussion of the propriety of the termination of parental rights of one parent and not the other in order to determine if the case against [Father] *should* continue, or if the entire case should be dismissed without further proceedings against either parent. At the urging of the Agency and the Guardian Ad Litem[,] who argued strongly against dismissing the Petition against [Father], and over the argument of Counsel for [Father], the Court concluded that the case against [Father] should continue and that [Father] should be permitted to offer evidence on his behalf with respect to the issue of termination of his parental rights—**thus allowing the Court to consider all of the evidence prior to rendering its decision** . . . .

Despite the Court's *sua sponte* findings regarding the Agency's Petition against [Mother], and [Father's] allegations supporting his Motion to Recuse, **this Court has not issued any final judgment regarding the Agency's Petition against [Father]**, nor has this Court precluded the presentation of evidence on his behalf. Specifically, this Court has not precluded [Father] from calling [Mother] or her parents . . . as witnesses on his behalf. Should they be called as witnesses, the credibility of their testimony will be evaluated by the Court just as the credibility of any witness's testimony is evaluated.

Finally, it was in the interest of judicial economy for the Court to advise counsel for the parties of its findings with respect to Agency's Petition against [Mother]. As the case concluded its third day of evidence and was moving toward a fourth (with little hope of concluding the evidentiary proceedings after the fourth day), it would have been a waste of scarce judicial resources to permit a case to proceed that this Court found to be lacking the clear and convincing evidence required in order for the Agency's Petition to be granted. Simply stated, there was no legitimate basis to continue the proceedings against [Mother]. For the same reason, it is not in the interests of judicial economy for this Court to recuse at this stage in the case.

For all the reasons stated above, this Court will not recuse itself from this case based on an allegation of the appearance of impropriety. **This Court is absolutely certain that it has adjudicated and will continue to adjudicate the Agency's Petition for the involuntary termination of [Father's] paren-**

**tal rights with the upmost fairness and impartiality according to the law and the Code of Judicial Conduct.**

Trial Court Order, 8/1/13 at 1–2 (footnotes omitted, emphases in original and added).

Thus, as illustrated by the forgoing explanation, the record belies Father's insinuation that the trial court rendered a premature decision regarding the termination of his parental rights before he had an opportunity to present evidence. In reality, the trial court merely found that, unlike its perspective of CYS's case against Mother, it believed the agency adduced sufficient evidence to support its petition against Father so as to survive compulsory nonsuit. Indeed, the trial court stated emphatically that it had not rendered an ultimate determination regarding CYS's petition concerning Father and that it would consider all of Father's evidence prior to rendering its decision. There is nothing in the certified record to cause us to doubt the trial court's explanation or to question the court's view of its ability to preside impartially over the remaining proceedings. Thus, this argument fails.

Father's remaining argument concerns the trial court's comment regarding the wisdom of Mother's proposed testimony as to other allegations of abuse. Father complains that the statements influenced Mother's decision to testify and impaired his ability to present untainted evidence in his defense. This assertion fares no better than Father's initial criticism of the trial court.

Simply stated, Father cannot satisfy his burden of production. The trial court's comment is not "evidence ˙ establishing bias, prejudice or unfairness which raises a substantial doubt as to the jurist's ability to preside impartially". *In re S.H.*, *supra* at 808. Indeed, while the trial court's remark to Mother's counsel may have been imprudent, it did not prevent Father from calling Mother or the maternal grandmother to testify. As the court explained before the evidentiary hearings reconvened, "[s]hould [Mother and maternal grandmother] be called as witnesses, the credibility of their testimony will be evaluated by the Court just as the credibility of any witness's testimony is evaluated." Trial Court Order, 8/1/13 at 2. Moreover, the court's statement did not taint Mother's testimony regarding the additional allegations of abuse. There was substantial evidence adduced in the case, including the Texas agency's finding of abuse by a preponderance of doubt, to establish that the initial abuse occurred. Mother never disputed that occurrence and, in fact, was the person who reported it to Texas authorities. However, Mother consistently testified that she never saw anything else happen to the children and that the children never told her of any additional abuse.

Indeed, Father's presupposition that Mother's putative testimony would be tainted ignores the fact that Mother testified about the allegations of additional abuse under the guardian *ad litem's* and CYS's inquiries during the permanency review hearing, and indicated that she was not aware of the other incidents. Specifically, she stated that she had no knowledge of multiple sexual contacts between Father and the children. N.T., 8/2/13, at 52. Thereafter, she stated that, after learning of the children's alleged disclosures to the foster parents and their therapist, she now believed that "something has had to happen to my children[.]" *Id.* at 54. She explained, "As a mother[,] I was never told[.] I took them to all of their doctor appointments. There was no sign of anything. I mean, I never witnessed anything, and the one time that I did walk in to what I believe was an inappropriate situation, that's whenever I called the police." *Id.* at 55. Later, responding to a

question that assumed that she was aware of the continuing abuse, Mother testified, "I know nothing happened and my children never came to me ... [claiming] something ... happened." *Id.* at 113. She further elucidated, "I never physically saw something happening to my children, except for the one time with the inappropriate behavior, and I called the authorities and did what I needed to. And before that, my children never came to me and said anything." *Id.* Accordingly, we find that the fact that Father declined to present Mother's testimony or any additional evidence to challenge the allegations that the abuse was ongoing is not evidence of the court's bias, prejudice, or impartiality.[5] It was a matter of trial strategy, and any perceived prejudice stemming from that decision was alleviated by Mother's subsequent testimony that she had not been aware of any other allegations of abuse. As there is no appearance that Father was deprived of a full and fair hearing on his parental rights, no relief is due.

Next, we address Father's argument that the trial court erred in terminating his parental rights when a no-contact order prevented him from communicating with K.R.D., A.D., and C.D. and relieved CYS from providing him reunification services. The following legal principles are relevant.

Grounds for termination of a biological parent's parental rights are governed by 23 Pa.C.S. § 2511. Herein, the trial court found sufficient evidence to terminate Father's parental rights under § 2511(a)(2) and (b), which provide in pertinent part as follows:

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

....

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

....

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511.

▪▪ The grounds for termination of parental rights under section 2511(a)(2) are not limited to affirmative misconduct. *In re A.L.D.,* 797 A.2d 326, 337 (Pa.Super.2002). The grounds include acts of

---

5. While Mother failed to file a brief in this appeal, her position in the related consolidated appeals is consistent with our discussion herein. She elucidates that, while she had intended to testify on her own behalf in the termination matter, her testimony was unnecessary once the trial court found CYS present-

ed insufficient evidence to proceed against her. Moreover, she points out that she has consistently testified, including at the ensuing permanency proceedings, that the children did not tell her of the additional abuse. *See* Mother's brief in the consolidated appeals 1602–1604 MDA 2013, at 23.

refusal as well as an incapacity to perform parental duties. *Id.* Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *Id.* at 340.

In *In re Geiger,* 459 Pa. 636, 331 A.2d 172 (1975), our Supreme Court first announced the fundamental test in terminating parental rights pursuant to section 2511(a)(2). According to *Geiger,*

> three things must be shown before a natural parent's rights in a child will be terminated: (1) repeated and continued incapacity, abuse, neglect or refusal must be shown; (2) such incapacity, abuse, neglect or refusal must be shown to have caused the child to be without essential parental care, control or subsistence; and (3) it must be shown that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*Id.* at 173–174; *see also In Interest of Lilley,* 719 A.2d 327, 330 (Pa.Super.1998).

██ Instantly, the trial court found that the evidence established that Father's parental rights warranted termination under § 2511(a)(2) because, as illustrated by the multiple allegations of sexual abuse, Father cannot safely parent the children and cannot remedy his parental incapacity. For the reasons that follow, we agree.

The crux of Father's argument is that the no-contact order and the denial of reunification services impeded his ability to demonstrate his desire to parent. He further asserts that he attempted to overcome these barriers by maintaining contact with CYS and providing health insurance for the children.

In *In re B.L.W.,* 843 A.2d 380 (Pa.Super.2004) (*en banc*), this Court explained that the focus of a termination proceeding is on the parents' conduct, and the adequacy of the agency's reunification efforts is

not a valid consideration. *Id.* at 384 n. 1. Thus, while Father is accurate in stating that CYS failed to provide him reunification services, albeit with good reason, that omission alone is not a basis to disturb the trial court's order terminating his parental rights.

Likewise, while Father does not invoke our holding in *In re R.C.,* 945 A.2d 182 (Pa.Super.2008), for the proposition that the court's no-contact order interfered with his reunification efforts, we observe that *In re R.C.* is readily distinguishable. In that case, we found that the agency could not use a parent's compliance with a no-contact order as a basis to demonstrate that he failed to contact the child for more than six months. *Id.* at 184. However, unlike the facts underlying our decision in *In re R.C.,* herein, the court did not rely upon the no-contact order to demonstrate Father's refusal or inaction. We agree that, had the trial court adopted that position, the rationale would be illogical. Instead of invoking Father's inaction as basis to terminate parental rights, the trial court cited the no-contact order to find that, since Father by his own conduct was precluded from interacting with the children, he was unable to perform his parental duties. We agree with the trial court's conclusion that CYS adduced sufficient evidence to prove the statutory grounds to terminate Father's parental rights pursuant to 2511(a)(2).

██ The instant scenario, where a no-contact order renders Father incapable of performing his parental duties, is analogous to the situation encountered by parents subject to long-term imprisonment. In *In re Adoption of S.P.,* 616 Pa. 309, 47 A.3d 817 (2012), our Supreme Court clarified the case law addressing the effects of incarceration upon a parent's ability to provide essential care and control pursuant

to § 2511(a)(2). After reviewing the relevant case law, the High Court reasoned,

> [W]e hold that incarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under § 2511(a)(2) where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied.

*Id.* at 828. The Court expounded,

> In line with the expressed opinion of a majority of justices in [*In re R.I.S.*, 614 Pa. 275, 36 A.3d 567 (2011) ], our prior holdings regarding incapacity, and numerous Superior Court decisions, we now definitively hold that incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing "essential parental care, control or subsistence" and the length of the remaining confinement can be considered as highly relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent," sufficient to provide grounds for termination pursuant to 23 Pa.C.S. § 2511(a)(2).

*Id.* at 830. In sum, a parent's incarceration is relevant to the section (a)(2) analysis and, depending on the circumstances of the case, it may be dispositive of a parent's ability to provide the "essential parental care, control or subsistence" that the section contemplates. *See* 23 Pa.C.S. § 2511(a)(2).

 Just as our Supreme Court discussed a parent's incapacity relative to long-term incarceration in *In re Adoption of S.P.*, *supra*, parental incapacity caused by a no-contact order is not only relevant to a court's conclusion that grounds for termination exist under § 2511(a)(2), but

where, as here, the order is required to protect the children from further sexual abuse at the hands of the excluded parent, we find that it is dispositive.

Father's repeated behaviors and his failure to be present for his children due to the no-contact order has caused the children to be without essential parental care, control, or subsistence necessary for their physical and mental well-being. Notwithstanding Father's moderate ·compliance with the few requirements CYS established for him, the conditions and causes of his parenting incapacity cannot be remedied as long as the no-contact order remains in place. We agree with the court's refusal to put on ·hold the need for consistent parental care and stability of K.R.D., A.D., and C.D. simply because Father must abide by the no-contact order that was entered for their safety. Thus, we reject Father's premise that the trial court erred in terminating his parental rights based upon his inability to remedy his parental incapacity.

 We also reject Father's assertion challenging the trial court's needs-and-welfare analysis under § 2511(b). Father complains that the court lacked sufficient evidence to determine the effects of severing Father's parental rights. We have emphasized that while a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one ·of many factors to be considered by the trial court when determining what is in the best interest of the child. *In re K.K.R.–S.*, 958 A.2d 529, 535–536 (Pa.Super.2008). The mere existence of an emotional bond does not preclude the termination of parental rights. *See In re T.D.*, 949 A.2d 910 (Pa.Super.2008) (trial court's decision to terminate parents' parental rights was affirmed where court balanced strong emotional bond against parents' in-

ability to serve needs of child). Rather, the trial court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." *In re Adoption of T.B.B.*, 835 A.2d 387, 397 (Pa.Super.2003) (emphasis added). Moreover, as we explained in *In re K.Z.S.*, 946 A.2d 753, 763 (Pa.Super.2008) (emphasis in original),

> In addition to a bond examination, the court may equally emphasize the **safety** needs of the child under subsection (b), particularly in cases involving physical or sexual abuse, severe child neglect or abandonment, or children with special needs. The trial court should also examine the intangibles such as the love, comfort, security and stability the child might have with the foster parent. Another consideration is the importance of continuity of relationships to the child and whether the parent–child bond, if it exists, can be severed without detrimental effects on the child. All of these factors can contribute to the inquiry about the needs and welfare of the child.

*See also In re A.S.*, 11 A.3d 473, 483 (Pa.Super.2010) (orphans' court can emphasize safety needs, consider intangibles, such as love, comfort, security, and stability child might have with the foster parent, and importance of continuity of existing relationships).

Instantly, the trial court acknowledged that CYS adduced scant evidence regarding the children's bonds with Father. The court cited testimony that K.R.D. is fearful of returning to either of his parents and desires to be adopted by the foster family. Likewise, it noted that A.D. asked about

Father on only a couple of occasions. The court also observed that the lack of relationship among Father and his three children stemmed directly from the court's desire to continue to protect the children from Father's sexual abuse which resulted in the no-contact order. Relying upon our discussion in *In re K.K.R.–S., supra,* the trial court explained that it did not consider the lack of evidence regarding a parent-child bond to be dispositive of its § 2511(b) needs and welfare analysis because the remaining evidence established that terminating Father's parental rights would best serve the children's developmental, physical, and emotional needs and welfare.

The certified record sustains the trial court's determination. While two psychologists [6] who are involved with this case did not interview Father or consider any evidence regarding a putative relationship between Father and the three children, Donna Roland, a therapist with Lutheran Counseling Services, testified during the evidentiary hearing about her therapeutic sessions with K.R.D. and A.D. N.T., 7/10/13, at 121. Her testimony regarding the children's collective developmental, physical, and emotional needs and welfare is instructive. Ms. Roland described the therapeutic regimen as play therapy with a special focus on attachment. *Id.* She has been treating K.R.D. and A.D. since October of 2012. *Id.* at 122.

Although Ms. Roland's initial testimony concerned K.R.D.'s and A.D.'s respective ability to testify in this case, she also provided insight to the children generally. For instance, Ms. Roland described K.R.D. as emotionally guarded and hesitant to trust others. *Id.* at 124. He experiences

---

6. Amy Taylor, Ph.D., conducted an assessment of Mother's parental fitness, and Kasey Shienvold, Ph.D., performed a bonding assessment among Mother, K.R.D., A.D., and C.D. Neither psychologist contacted Father during their review of this case, evaluated him, or observed him interact with the children. *See* N.T. (A.M.), 7/2/13, at 88; N.T. (P.M.), 7/2/13, at 56.

nocturnal enuresis and nightmares following upsetting situations. *Id.* at 124, 127. Early in his treatment, K.R.D. frequently suffered from bedwetting and nightmares following his visitations with Mother. *Id.* at 132. However, Ms. Roland believed that K.R.D. is doing fairly well presently. *Id.* at 132–133. K.R.D. refers to Father only when Ms. Roland initiates the topic in the course of therapy. *Id.* at 199.

K.R.D. is working on relationship issues, and his attachment with the foster family is developing nicely. *Id.* at 194. Ms. Roland testified that he is "developing a strong sense of attachment with them[,] . . . he feels very safe and when he is upset or struggles with something[,] he knows he can talk to them. I think he trusts them very much." *Id.* at 198. She added that "he's been expressing a desire to stay where he is [in the foster home] and the relationship [with the foster family] has been the focus of therapy." *Id.* at 195, 198. She continued that his response, "that he definitely wants to be adopted[,]" was an organic statement during therapy. *Id.* at 196–197. She indicated that K.R.D. also expressed fears that bad things would happen to him if he is not adopted. *Id.* at 197. She opined that regardless of the outcome of this case, K.R.D.'s development of an attachment with the foster family has established a blueprint for him to fashion healthy relationships in the future. *Id.*

As it relates to A.D., Ms. Roland indicated that A.D. tends to act out sexually when she is distressed. *Id.* at 123, 126. That reaction has led to unhealthy behavior with boys at her foster home and elementary school. *Id.* at 126, 132. She indicated that every time A.D. shares details of the abuse, she is forced to relive it to some extent. *Id.* at 126. As with K.R.D., Ms. Roland testified that A.D. is doing fairly well with her symptoms. *Id.* at 133. Ms. Roland explained that, while A.D. "used to

hang all over [her,] [s]he greets [her] appropriately now [and] saves her excessive . . . very expressive affections for foster parents." *Id.* at 199. Ms. Roland subsequently explained that the foster home is a place where A.D. feels comfortable discussing anything. *Id.* at 201.

The children's foster father ("Foster Father") also testified during the hearings. He stated that the children have resided in the foster home for approximately nineteen months and that they are doing well. N.T., 7/29/13, at 86–87. Seven-year-old A.D. maintains a typical sibling relationship with the other children in the home. *Id.* at 86, 99. She is blossoming in school and making progress toward drawing level with her peers academically. *Id.* at 99. K.R.D., whom Foster Father described as a bright eight-year-old boy, took some time to adjust but is beginning to thrive in the home. *Id.* at 87. Foster Father indicated that the youngest child, C.D., was developmentally-delayed when the children first arrived but he is developing well at this point. *Id.* Similarly, physical ailments that C.D. previously suffered with his spine and bowels have returned to near normal. *Id.* at 99, 126. However, he attends physical therapy twice a month. *Id.* at 126.

Foster Father further confirmed that he and his wife desire to adopt the three children if the trial court terminates Mother's and Father's parental rights. *Id.* at 98. He testified that K.R.D., A.D., and C.D. all have developed bonds with him. *Id.*

During cross-examination, Foster Father testified that K.R.D. and A.D. were emotionally damaged when CYS first placed them in foster care. Soon after arriving, K.R.D. began to have issues with nocturnal enuresis and trouble controlling his bowels during daytime activities. *Id.* at 110. He explained that approximately

two weeks after he was placed, K.R.D. began having five or six incidents per week. *Id.* However, after the child began to disclose the scope of sexual abuse that Father perpetrated on him and A.D. while the family lived in Texas, the frequency of the incidents declined to what Foster Father calculated to be a six-week interval between accidents. *Id.* at 110–111. K.R.D. is now able to control his bowels and only wets his bed following troubling visitations with Mother or a nightmare. *Id.* at 107, 108. Foster Father explained that K.R.D. had fifteen to eighteen accidents in the past six months but only three incidents in the past three months, including one in the month preceding the hearing. *Id.* at 109–110.

Foster Mother testified consistent with her husband. She confirmed that K.R.D., A.D., and C.D. have developed strong relationships with the other children in the home and that she and Foster Father desire to adopt K.R.D., A.D., and C.D. if Mother's and Father's parental rights are terminated. *Id.* at 140. Neither of the school-aged children has an individualized educational plan ("IEP"). *Id.* at 168. She stated that A.D. lags behind her peers in reading, but she does not require individualized planning. *Id.* at 169. K.R.D. is thriving academically and is very advanced for his age. *Id.*

Foster Mother testified about changes in A.D. since her placement. She described several disturbing examples where A.D. failed to recognize appropriate boundaries and acted out sexually. A.D. manipulated her foster brother to lay on top of her in a position that Father allegedly assumed during one of the incidents of abuse. *Id.* at 142. When Foster Mother discovered what was occurring, A.D. advised her that, when you like someone, "that is what you have them do." *Id.* at 142. On a different occasion, A.D. kissed her foster sibling and

grabbed the boy's genitals while they were playing in the yard. *Id.* at 166. When she was confronted about that behavior, A.D. explained, that "she was pretending they were teenagers and he was her boyfriend." *Id.* Likewise, A.D. was caught with a male classmate in the bathroom at their elementary school. *Id.* at 142. Both of the children had pulled their pants down. *Id.* Again, A.D. explained, "She liked him, and that's what you do when you like somebody." *Id.* A.D. is currently addressing these behaviors with Ms. Roland. *Id.* at 167.

Foster Mother also described the children's demeanor following visitations with Mother. Initially, A.D. would be very upset; however, over time that behavior settled down and now she is very quiet. *Id.* at 165. On some occasions, A.D. provides a glimpse into what occurred during the visitation with Mother. For example, following one visitation, A.D. offered, "Mommy told us to stop talking to you[.]" *Id.* Following an additional inquiry, A.D. explained that Mother would whisper directives in the child's ear while sitting on the floor with the children. *Id.* Foster Mother advised the caseworkers of the allegations. *Id.*

As it relates to C.D., Foster Mother reiterated that the child has progressed well with his developmental delays. Although he is still primarily nonverbal, he knows a few signs and speaks occasionally. *Id.* at 168. He continues to work on his communication skills, but attends occupational therapy less frequently. *Id.* When he was first placed with the foster family as a seven-month-old baby, C.D. could not sit up and his skull was misshaped from Mother laying him on his side. *Id.* However, as a two-year-old boy, he is physically active, "running, jumping, climbing, [and] getting into all kinds of trouble." *Id.*

Mindful that the needs and welfare analysis is reviewed on a case-by-case basis, and with consideration of both the nature and extent of the children's relationships with Father, the intangible factors that we outlined in *In re K.Z.S., supra* and *In re A.S., supra,* such as safety needs, the love, comfort, security, and stability the children enjoy with their foster family, and the importance of continuing those beneficial relationships upon their emotional and developmental well-being, we find sufficient evidence in the certified record to sustain the trial court's determination. As there is no evidence of a parent-child bond between Father and K.R.D., A.D., or C.D., it is reasonable to infer that no such bond exists. Moreover, to the extent some bond exists between Father and the older children despite his serial sexual abuse and prolonged lack of contact, the certified record demonstrates that terminating Father's parental rights would best serve their developmental, physical, and emotional needs and welfare.

Accordingly, for all of the foregoing reasons, we affirm the orders terminating Father's parental rights to K.R.D., A.D., and C.D. pursuant to 23 Pa.C.S. § 2511(a)(2) and (b).

Orders affirmed.

Justice FITZGERALD files a Concurring Statement.

CONCURRING STATEMENT BY FITZGERALD, J.:

I join the learned majority's opinion. However, I do not read the opinion as either establishing a bright-line rule or as holding that the mere existence of a no-contact order is dispositive when considering termination of parental rights under 23 Pa.C.S. § 2511(a)(2). In my view, the effect of a no-contact order must be considered in light of the circumstances of each case.