J-S73017-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: J.R., JR., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.R., FATHER | No. 1325 MDA 2014 |

Appeal from the Order Entered July 3, 2014
In the Court of Common Pleas of Lancaster County
Orphans' Court at No: 45 of 2014

BEFORE:  BOWES, J., WECHT, J., and MUSMANNO, J.

MEMORANDUM BY WECHT, J.:                **FILED DECEMBER 19, 2014**

J.R. ("Father") appeals the July 3, 2014 order that terminated his parental rights to J.R., Jr. ("Child").[1]  After careful review, we affirm.

The trial court summarized the procedural and factual history of this case as follows:

> This matter comes before the court on the Petition filed by the Lancaster County Children and Youth Social Service Agency (hereinafter "Agency") to terminate the parental rights of [Father] and [C.T. ("Mother") (collectively, "Parents")], birth parents of [Child].  The petition was filed on January 8, 2014 and notice in accordance with the provisions of the Adoption Act was provided to Parents.  The petition was served on Parents on February 25, 2014.  [Child] has now been in placement for almost 18 months.  A full hearing was held on March 25, 2014, and then additional testimony was presented on April 22, 2014.  Juvenile records were incorporated fully at the termination hearing on March 25, 2014.

_____

[1]     The court also terminated the parental rights of C.T. ("Mother") in the July 3, 2014 order.  Mother also filed a notice of appeal that was docketed at 1268 MDA 2014.  That appeal is disposed of in a separate memorandum.

\* \* \*

The relevant facts are as follows: [Child] is a minor child born [in November 2012], in Lancaster County, Pennsylvania. At the time of [Child's] birth, Mother and Father were living together in a motel room at Penns Woods Inn, in Manheim with three other people. Additionally, Mother had a previous history with the Agency, and her first[-]born child was placed with a family friend under a safety plan that was developed due to neglect [of the child] while under Mother's care. Mother's older child was subsequently adopted by the resource family.

Due to these concerns, [Child] was released from the hospital under a safety plan on December 13, 2012. On December 15, 2012, the safety plan family contacted the Agency and stated they were no longer willing to keep the child. [Child] has been in Agency care since December 16, 2012. [Child] was placed in the resource home that adopted his older half-brother and has done very well there. At the time of placement, the Agency was very concerned with Mother and Father's inappropriate housing, Mother's mental health and their parenting skills.

The court approved a Child Permanency Plan that included the following goals for both Mother and Father: mental health, parenting, income, housing, and commitment to the child. At the hearing, the caseworker testified that she had provided them with information on low-income housing and how to apply for it. She also spoke to them about websites they could use to find housing and how to look in the newspaper. At that time, the caseworker also offered to continue providing the information and assist in filling out applications. Both parents have completed their mental health goals, have demonstrated a commitment to the child by regularly attending visits, and now have sufficient income. However, Parents have been unable or unwilling to find appropriate housing for the child. Mother and Father were also unable to start working on the parenting goal, as the Personalized Parent Trainer [("PPT")] could only be put in place once the housing goal was met.[3] In addition to verbal communication, the Agency sent letters to Parents on June 6, 2013, August 5, 2013, September 4, 2013 and December 9, 2013 in which [it] encouraged Parents to keep the Agency updated and to find housing so that a referral to a [PPT] program could be made. [Child] has now been in placement for almost 18 months.

[3]  The Agency determined that a parenting class would not be sufficient to satisfy the parenting goal, due to Mother's demonstrated parenting deficits with her older child.

At the first review hearing on June 4, 2013, the caseworker testified that Mother and Father were still residing at the Penns Woods Inn, but they had plans for housing. The caseworker also testified that she explained to Mother and Father that she could not make a referral to a Personalized Parent Trainer until there was more stable and appropriate housing. The caseworker stated, "I think that they're both committed to getting housing, and I think that knowing that the biggest step, being the parenting, can't start until that happens . . . I think, if anything, they're definitely going to make sure they have it done now."

The caseworker testified that, in 2013, Father was reporting to the Agency that he was making $800 per week. In actuality, Father had made approximately $5,000 for the entire year of 2013. Mother reported to the Agency that she was filing for SSI and would receive around $900 per month. Based upon the income being reported to the caseworker, the Agency did not provide services to help Parents apply for low-income housing. Additionally, Parents repeatedly indicated to the caseworker that they were identifying appropriate housing and therefore did not need support finding a place to live. The parents are solely responsible for the misinformation given to the Agency and Court concerning their income and housing prospects, which directly affected the services provided to them.

Father first told the Agency that he had trouble locating housing in October of 2013, after the child had been in placement for 10 months. At a hearing before the Master on October 2, 2013, the caseworker stated: "The income is less than we expected. Part of the Agency's sort of hands-off approach at finding housing was an impression to us that they had sufficient funds . . . So there will be some additional efforts put forth in terms to help to find some housing." The caseworker again stated that the PPT would only be willing to work with the family in a potentially permanent home, and they would not accept a referral while Mother and Father continued to reside in the motel. [The] caseworker also testified that Parents indicated that part of their struggle finding housing was their low credit score. The

caseworker had made calls to Tabor[2] but had not been called back. The caseworker also testified that she was going to ask Mother and Father to sign a release so she could talk with the landlord to figure out what it would take for Parents to switch from the motel room to an apartment on the same premises.

The caseworker spoke with Father in November 2013, and he told her that a family friend was willing to rent them a basement apartment for $250 or $500 a month,[13] which was less than what they paid to the motel. The caseworker testified that at that time she told Father that was a good option, because even if it was not appropriate for the child, they would save money to put towards an apartment. The caseworker stated that Father told her in December that moving into the basement apartment would not happen, as he did not think it would be the right place for the child. At this point, [Child] had been in Agency custody for a year.

[13] The record is unclear. The caseworker originally testified that the rent of the basement apartment would be $450-$500, but later stated that it was $250. Parents were paying about $750/month at the motel where they were staying.

At the initial termination of parent rights and review hearing on February 25, 2014, the caseworker stated that the parents had progressed only minimally on their child permanency plans since the first review. The caseworker stated, "They certainly took a lot of steps early on, but there seems to be not much follow-through lately." [He] testified that parents still did not have stable income, they continued to reside in the Penns Wood Inn, and therefore had not been referred for parenting. The caseworker also testified that Parents had completed the mental health component of their plans and continued to attend and behave appropriately at visits [with Child], however they did not seem dedicated to completing their plans. The caseworker stated that [he] was suspicious as Parents kept telling [him] that they were applying for housing, but had not provided [him] with any names, applications, or records of income.

---

[2] Tabor is a Lancaster County community organization that assists with housing and provides financial counseling.

Father testified at the [February 2014] hearing that he was laid off from Good's Dairy in November of 2013, where he worked for 8 years, and only earned approximately $5,000 before he was let go in 2013. He had earned approximately $800 per [week] (approximately $40,000 a year) in prior years. He stated that he had filed for unemployment but was denied due to inadequate hours, and at the time of the hearing his appeal was still pending. Father stated that he was unable to obtain employment because he needed Monday afternoons off in order to attend visits. Father told the Court that his friend was buying a lot with a house on it, and hopefully they could move in by March 1, 2014. The caseworker met with Father on March 3, and he told the caseworker that he would be meeting with the landlord later that week to sign a lease. Prior to the termination of parental rights hearing on March 25, 2014, Father informed the caseworker that they would not be moving into that property in the immediate future as the current tenant was still living in the house and the potential landlord had not purchased the property yet. At this point [Child] had been in care approximately 15 months.

The termination of parental rights hearing was continued to April 22, 2014 in order for Parents to prepare their testimony and the potential landlord's testimony. When the Court reconvened in April, Parents had changed their plan yet again, and were no longer going to live in the house from the March hearing, and were now planning on renting a house with Father's birth mother, [D.C.].[29] Both Father and [D.C.] testified that they had signed a lease on a duplex, and would be moving in June 1, 2014. A copy of the lease was presented at the hearing, marked as an exhibit and admitted to the record. As of the June 1, 2014 occupancy date, [Child] would be in care for approximately 16 months.

[29] Father's birth mother has a history with the Agency. She placed Father for adoption when he was an infant. Father did not have any contact with his birth mother until very recently.

Trial Court Memorandum and Order ("T.C.M."), 7/3/2014, at 1-6 (some footnotes omitted; minor modifications to capitalization and punctuation).

Following the hearings, on July 3, 2014, the trial court issued a memorandum and order that terminated Mother's and Father's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(8) and (b).  On August 4, 2014, Father timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).  On August 13, 2014, the trial court filed a Pa.R.A.P. 1925(a) opinion.

Father raises four issues for our review:

1. Whether the court erred by terminating Father's parental rights when environmental factors beyond his control caused any failure to complete a child permanency plan[?]

2. Whether the court abused its discretion by terminating Father's parental rights when the child has a bond with Father and there was insufficient evidence presented to determine if the termination of the relationship with Father would harm the child[?]

3. Whether the court erred in determining the parenting goal required a personalized parenting trainer (PPT) where the plan only specified an agency[-]approved program and the court did not mandate a PPT during any point in the proceedings?

4. Whether the court erred in terminating Father's parental rights where the Agency failed to fulfill their obligations to assist the parents with reunification and presented ongoing resistance to the parents[?]

Father's Brief at 4.

Our scope and standard of review are as follows:

In an appeal from an order terminating parental rights, our scope of review is comprehensive: we consider all the evidence presented as well as the trial court's factual findings and legal conclusions.  However, our standard of review is narrow: we will reverse the trial court's order only if we conclude that the trial

court abused its discretion, made an error of law, or lacked competent evidence to support its findings. The trial judge's decision is entitled to the same deference as a jury verdict.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Further, we have stated:

Where the hearing court's findings are supported by competent evidence of record, we must affirm the hearing court even though the record could support an opposite result.

We are bound by the findings of the trial court which have adequate support in the record so long as the findings do not evidence capricious disregard for competent and credible evidence. The trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence. Though we are not bound by the trial court's inferences and deductions, we may reject its conclusions only if they involve errors of law or are clearly unreasonable in light of the trial court's sustainable findings.

*In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citations omitted).

The trial court terminated Father's parental rights pursuant to section

2511(a)(8) and (b), which provide in relevant part:

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\* \* \*

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

To terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8), the following factors must be demonstrated: (1) the child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child.  Section 2511(a)(8) sets a 12-month time frame for a parent to remedy the conditions that led to the [child's] removal by the court.  Once the 12-month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of [the child welfare agency] supplied over a realistic time period.  Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of [the child welfare agency's] services.

*In re K.Z.S.*, 946 A.2d 753, 759 (Pa. Super. 2008) (citations omitted).

While Father presents four issues in his Statement of Questions Presented, he divides his brief into three sections – two discussing subsection 2511(a)(8) and one briefly discussing subsection 2511(b). Therefore, we will follow a similar format.

Father argues that he does not yet have appropriate housing, but he attributes that failure to factors beyond his control. Father asserts that his income is sufficient to secure housing, but that his lack of a credit score has prevented him from obtaining housing. Father also argues that the lease that he presented at the last hearing satisfies the Agency's requirements. Father's Brief at 14-16. Father also contends that he could have fulfilled the parenting requirement through a non-PPT program, but that the Agency refused to cooperate. *Id.* at 16-17.

A parent's rights are not to be terminated based upon an environmental factor, such as housing, that is outside the parent's control. 23 Pa.C.S.A. § 2511(b). In this case, the Agency made clear that housing was a priority. Notes of Testimony ("N.T."), 2/25/2014, at 22. Matthew McCafferty, the caseworker, had been informed about various plans from Father about housing, but Father never provided any details, such as lease applications, names of contacts, or any records. *Id.* at 19-21. At the termination hearing, Mr. McCafferty testified that Mother or Father told him four or five different times that they had secured housing, only to have it not work out. N.T., 3/25/2014, at 19, 33. Parents' residence at the motel was a single, small room with a microwave and an adjoining bathroom. *Id.* at 19-20.

The trial court concluded that Father misled the Agency about the housing situation. T.C.M. at 7. The court specifically found that Father's excuses for failing to find housing, including his credit score issue, were not

credible. *Id.* at 8. The court determined that Mother and Father "lack[ed] motivation to secure appropriate housing" and that there was "a frequent pattern of little information provided to the Agency, extremely late follow through, and no documentation." *Id.* at 7. Further, Father's lack of transparency about housing caused the Agency to provide less assistance than it might otherwise have provided. Trial Court Opinion ("T.C.O."), 8/13/2014, at 2. The trial court concluded that Mother and Father were the sole cause of their lack of appropriate housing. T.C.M. at 8. While the termination was due, in part, to the housing issue, the court found, and the record supports, that this was not outside of Father's control. Regarding the lease with D.C. that was produced at the April 22 hearing, the court may not consider it because it is prohibited from considering post-petition conduct. *See* 23 Pa.C.S.A. § 2511(b); *In re D.W.*, 2004 PA Super 320, 856 A.2d 1231, 1235 (2004) (holding that the "restriction [against considering post-petition conduct] set forth in § 2511(b) applies to the entire termination analysis"). Therefore, it did not err in finding that the lease Parents entered into with D.C. did not suffice to remedy the housing problem.

Next, Father argues that the inability to complete the parenting goal was also outside of his control. The trial court stated that, based upon Mother's previous involvement with the Agency, it had "serious concerns" about Mother's ability to parent. T.C.O., at 1. Further, because Father worked, Mother would be the primary caretaker if Child was returned to the home. Therefore, the trial court determined that a PPT was necessary to

alleviate those concerns, that parenting classes or other alternatives would not have provided enough guidance to ensure that Mother could parent Child adequately, and that the PPT was the only method by which Parents could meet their goal. *Id.* at 1-2. Because Parents' housing was not appropriate, the PPT could not work with them in their residence to assess parenting or work with Parents and Child. *Id.* at 2.

We find nothing in the record to contradict the trial court's statements. At the last permanency review in February 2014, the trial court stated that the parenting referral could not occur until Parents secured housing. N.T., 2/25/2014, at 31-32. "[T]ermination under subsection (a)(8) does not require an evaluation of [the parent's] willingness or ability to remedy the conditions that led to placement of the children. Instead, subsection (a)(8) requires only that the conditions continue to exist after the twelve month period has elapsed." *In re Adoption of R.K.Y.*, 72 A.3d 669, 679-80 (Pa. Super. 2013) (citations and quotation marks omitted). While Father may have been willing to take other parenting classes, the court determined that they were not sufficient. We find no abuse of discretion.

Finally, Father briefly argues that the trial court failed to consider the bond between Child and Father in its consideration of Child's needs and welfare pursuant to 23 Pa.C.S.A. § 2511(b). In reviewing the evidence in support of termination under section 2511(b), our Supreme Court recently stated:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). However, this Court has held that the trial court is not required to order a formal bonding evaluation performed by an expert. *In re K.K.R.-S.*, 958 A.2d 529, 533 (Pa. Super. 2008). Additionally, "[t]he mere existence of an emotional bond does not preclude the termination of parental rights." *In re A.D.*, 93 A.3d 888, 897 (Pa. Super. 2014). Instead, the court must determine whether severing that bond would be detrimental to the child. *Id.* at 898.

Mr. McCafferty testified that Child's foster home was safe and secure. N.T., 3/25/2014, at 34. He also stated that Child's medical needs were "well-attended to" by his foster parents. *Id.* Child was placed in this home in January 2013, when he was approximately three months old. Child is "strongly attached" to the foster parents. *Id.* at 35. While Child interacts well with Father during the supervised visits, Mr. McCafferty opined that Child would not be harmed by the termination of Father's parental rights and that termination was in Child's best interest. *Id.* at 36-37.

The trial court credited this testimony. The court considered that Child has lived with the foster family for almost his entire life and that the foster parents have provided him with care and met all his needs. The trial court found that Child's primary bond and attachment was with his foster parents and that termination of Father's parental rights would not harm Child. T.C.M. at 10. Based upon the record before us, the trial court did not abuse its discretion in so finding.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/19/2014