J-S04044-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

IN RE: D.G., A MINOR     : IN THE SUPERIOR COURT OF
               :    PENNSYLVANIA
               :
APPEAL OF: A.G., BIRTH MOTHER  : No. 1179 WDA 2015

Appeal from the Order July 8, 2015,
in the Court of Common Pleas of Allegheny County,
Orphans' Court, at No(s): CP-02-AP-0000064-2014

BEFORE:  BOWES, OLSON, and STRASSBURGER*, JJ.

MEMORANDUM BY STRASSBURGER, J.:   **FILED FEBRUARY 29, 2016**

A.G. (Mother) appeals from the order entered July 8, 2015, in the Court of Common Pleas of Allegheny County, which terminated involuntarily her parental rights to her minor son, D.G. (Child).[1]  We affirm.

Child was born in October of 2012.  Immediately after his birth, Child's blood tested positive for opiates and he was removed from Mother's care by the Allegheny County Office of Children, Youth and Families (CYF).  Child was adjudicated dependent on December 14, 2012 and placed in foster care.[2]

---

\* Senior Judge assigned to the Superior Court.

[1] The identity of Child's natural father is unknown.  His parental rights were terminated on June 30, 2014.

[2] Mother had a prior history with CYF which, to some extent, precipitated CYF's dependency petition on behalf of Child.  Her older daughters, Child's half-sisters, were adjudicated dependent before Child's birth and placed in the permanent care of their paternal aunt. Additionally, Mother was incarcerated on a driving-under-the-influence (DUI) charge while she was pregnant with Child.  She was released two months prior to Child's birth.

CYF filed a petition for involuntary termination of parental rights (TPR) on April 11, 2014. On June 30, 2014, the orphans' court denied the petition, finding that CYF had not met its burden of proving that grounds for termination existed as to Mother. However, the court ordered Mother to participate in dual-diagnosis treatment and comply with the goals of the Family Service Plan (FSP) provided by CYF. Specifically, "CYF was ordered to refer Mother to mental health treatment and Mother was to take a copy of [a psychological evaluation completed by Dr. Neil Rosenblum] to her treatment provider to insure that the issues raised by Dr. Rosenblum were being addressed in treatment. Mother was to provide proof of her mental health treatment." Orphans' Court Opinion, 9/8/2015, at 2.

A permanency review hearing was held on September 14, 2014. At that hearing, Mother indicated that she had enrolled in mental health treatment as ordered, but had not provided Dr. Rosenblum's report to her new therapist. The goal change hearing was continued to November 14, 2014, pending an updated assessment by Dr. Rosenblum.

On November 14, 2014, the orphans' court found that Mother's compliance with the permanency plan was minimal, stating as follows.

> The court previously denied a TPR because the agency did not establish grounds. Dr. Rosenblum was not called as a witness at that time. Since the TPR denial, the court added an additional goal of mental health treatment to [Mother's] goals

During those two months, Mother repeatedly refused to cooperate with CYF's request for urine screens.

which she has not consistently attended. Additionally, concerns about [Mother's] continued contact with her family and the fact that her other children were in her care and at her mother's residence raise additional concerns. Additionally, [Mother] was present at her mother's residence when her sister who was subject to a warrant was arrested. Dr. Rosenblum re-evaluated [Mother] and continues to opine that, although [Mother] has some good skills with [Child], her mental health and personal situation is such that she is not currently stable enough to assume care for [Child], nor will she be stable enough within a reasonable period of time given the length of time [Child] has been in care.

*Id.* at 3. Based on these findings, the orphans' court changed the permanency goal to adoption.

A second TPR petition was filed on December 19, 2014. On January 23, 2015, Mother filed a motion requesting that the orphans' court recuse itself from the termination proceeding. That motion was denied, following a hearing, on January 30, 2015.

A termination hearing was held on June 29 and July 1, 2015. On July 8, 2015, the orphans' court entered its decree terminating Mother's parental rights. Mother timely filed a notice of appeal, along with a concise statement of errors complained of on appeal.

Mother now raises the following issues for our review.

1. Did the [orphans'] court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2) and (a)(5)?

2. Did the [orphans'] court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's

- 3 -

parental rights would best serve the needs and welfare of [Child] pursuant to 23 Pa.C.S. § 2511(b)?

3. Did the [orphans'] court abuse its discretion by failing to recuse [itself]?

Mother's Brief at 5 (orphans' court answers omitted).

We consider Mother's claims mindful of our well-settled standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the [orphans'] court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the [orphans'] court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The [orphans'] court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to [orphans'] courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the

standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the orphans' court terminated Mother's parental rights pursuant to Sections 2511(a)(2), (5), and (b). We need only agree with the orphans' court as to any one subsection of subsection 2511(a), as well as subsection 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we analyze the court's decision to terminate under subsections 2511(a)(2) and (b), which provide as follows.

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * *
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> * * *
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S. § 2511(a)(2), (b).

Mother argues that the orphans' court erred in terminating her parental rights under subsection (a)(2) where Dr. Rosenblum testified that she "possesses good parenting skills", and CYF caseworker Lawrence Walter stated that her interactions with Child are appropriate. Mother's Brief at 9.

The orphans' court addressed Mother's claim as follows.

> With respect to Mother's first issue, following the hearing on CYF's first TPR petition, [the orphans' court] ordered Mother to engage in mental health treatment and to provide her treating provider with a copy of Dr. Rosenblum's report so that the issues Dr. Rosenblum had identified would be addressed in treatment. One such issue that Dr. Rosenblum identified was that Mother needed to participate in intensive dual-diagnosis therapy. At the June 29th termination hearing, Dr. Rosenblum testified that Mother's "poor judgment, poor problem solving, how drugs and alcohol relate to that … troubled relationships with others, [] lack of ownership and responsibility, limited independence in her personal functioning, and difficulty accepting and responding to feedback from others" necessitated the intensive dual-diagnosis treatment. Yet, in spite of [the orphans' court's] June 30, 2014 Order, Mother failed to provide her therapist, Ms. Wilkinson, with a copy of Dr. Rosenblum's report in a timely manner and subsequently ceased attending her therapy sessions only after three short months.[5]

_____

[5] Although Ms. Wilkinson testified that it was not Mother's fault that Mother's services were delayed from July until November, it was Mother's decision to terminate the therapy only after ten individual sessions.

_____

> Furthermore, Mother only attended a little over 75 percent of her appointments during those brief months in which she was involved in therapy. Although Mother did attend weekly dual

diagnosis group therapy sessions during that time period,[6] Mother never engaged in any individual dual diagnosis treatment with Ms. Wilkinson per Dr. Rosenblum's recommendation.

_____

[6] The group therapy sessions were labeled as "dual diagnosis" because the individuals in treatment were engaged in either individual mental health or drug and alcohol treatment or both. However, the group therapy sessions were not necessarily targeted at treating individuals with dual diagnoses *per se.*

_____

At the termination hearing, Mother testified that she "quit" attending her individual and group therapy sessions at Mercy Behavioral Health because she felt that she was not "getting anywhere with the therapists and the groups." Mother further testified that she began "to look into better programs that would meet the goals of what Dr. Rosenblum wanted [her] to work on." Yet, at the time of the July 1, 2015 termination hearing, Mother was not engaged in any form of mental health treatment. Although Mother testified that she participated in mental health treatment at the Northside branch of Mercy Behavioral Health from April to June of 2015, Mother did not offer into evidence any proof of her treatment, nor did she sign releases for CYF to have access to her records from the Northside branch. Furthermore, neither Ms. Wilkinson nor Mr. Williams had any record that Mother was being treated at the Northside branch.

Even if [the court] had found Mother's testimony regarding her most recent treatment to be credible, the fact remains that in the year since [the court] ordered Mother to engage in mental health treatment, by her own admission, she only engaged in roughly five months of therapy. Moreover, for the entire year prior to the termination hearing, Mother never sought the dual-diagnosis treatment that Dr. Rosenblum stated was needed to remedy her incapacity and neglect. Further, based upon Dr. Rosenblum's evaluation, even if Mother had consistently attended therapy, there would be no assurance that the treatment would result in the type of change necessary for Mother to parent on a full[-]time basis.

Following the dependency adjudication, [Child] has never returned to Mother's care or had any unsupervised visitation with Mother because of Mother's continued incapacity.

Orphans' Court Opinion, 9/8/2015, at 5-6 (citations omitted).

The court's analysis is supported by the record. During the TPR hearing, CYF adoptions caseworker Gregory Williams testified that since June of 2014 the agency's "nonnegotiable goals" for Mother were visitation with Child and Mother's participation in mental health treatment. N.T., 7/1/12015, at 25-26. Mother was also instructed to address her housing situation, maintain sobriety and "positive mental health," and locate employment. *Id.* at 26. Mr. Williams testified that Mother has attended her scheduled supervised visitations with Child, but has not followed through on participation in mental health treatment. *Id.* at 29, 31. Mr. Williams further indicated that, as of the date of the hearing, Mother was not participating in drug and alcohol counseling, although her recent urine screens were negative. *Id*. at 34-35. Mr. Williams stated that, due to Mother's lack of follow-through with the nonnegotiable goal of seeking mental health treatment, her history of drug and alcohol dependence, and her general inconsistency with participating in court-ordered services, CYF was concerned with Mother's stability and ability to parent Child. *Id.* at 39-40.

Dr. Rosenblum testified that, when he initially evaluated Mother, he believed she had "skills and talent" as a parent and that reunification with her children was possible "if she could deal with her impulse control, her

- 8 -

anger, and her need for dual-diagnosis treatment." N.T., 6/29/2015, at 11. However, he testified that in the two and a half years since his initial evaluation he had not seen an appreciable change in Mother's behavior, particularly in her lack of independence and ownership over her decisions. *Id.* at 10-11.

Moreover, Debbie Wilkinson, Mother's Mercy Behavioral Health outpatient therapist testified that Mother unilaterally decided to stop attending individual therapy and dual-diagnosis group sessions there in February of 2015. N.T., 7/1/2015, at 11-15. Ms. Wilkinson testified that Mother attended approximately 75% of her scheduled sessions before discharging herself from the programs. *Id.* at 18.

CYF caseworker Lawrence Walter testified that, while the agency believed that Mother's interaction with Child during supervised visitations was appropriate, concerns remained over Mother's long-term mental health, sobriety, and personal stability. *Id.* at 58-59, 64. He testified that CYF has had the same goals in place for Mother since 2011, when her older children were declared dependent. *Id.* at 63. Those goals have not been addressed adequately in that time, leading CYF to conclude that "the length of this case and the assorted efforts … made to resolve these issues without success suggests that they are unlikely to be resolved any time in the near future." *Id.* at 63.

During her testimony, Mother admitted that she left Mercy Behavioral Health in February of 2015 because she did not believe she was "getting anywhere with the therapists and the groups that [she] had so [she] started to look into better programs" that would meet her dual-diagnosis goals. *Id.* at 75. As of the TPR hearing, Mother was not receiving any mental health or drug dependency treatment, although she testified that she had sought referrals from CYF, but admitted that she had not followed-up. *Id.* at 78. Mother testified that she was sober, having weaned herself off of opiates, including methadone. *Id.* at 80-81.

Despite Mother's progress in achieving sobriety in the months leading up to the TPR hearing, the record reveals that Mother has not addressed the nonnegotiable goal of obtaining and maintaining mental health treatment, despite being given ample opportunities to do so. In fact, Mother unilaterally discharged herself from her dual-diagnosis program. While she claims to have sought a better program, she had not enrolled in treatment in the four months between her voluntary discharge and the TPR hearing. Further, despite listing a few referrals, Mother failed to indicate when, if at all, she intended to enroll in a new program. Accordingly, because the record supports a determination that Mother cannot or will not remedy her incapacity, we hold that the trial court did not err in finding that CYF met its burden under subsection 2511(a)(2). *See, e.g., In re C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*) ("[I]f we were to permit Mother

further opportunity to cultivate an environment where she can care for C.L.G., we would be subjecting a child, who has been waiting for more than two years for permanency, to a state of proverbial limbo in anticipation of a scenario that is speculative at best.").

We now turn our attention to subsection 2511(b). We have discussed our analysis under that subsection as follows.

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010) (some citations omitted).

Here, the orphans' court concluded that terminating Mother's parental rights would best serve the needs and welfare of the Child:

> Mother argues that termination "permanently and unnecessarily deprives [Child] of the love, companionship and affection of his biological mother with whom he is bonded." Dr. Rosenblum testified that [Child's] primary attachment is to his foster parents, as they are the individuals to whom his sense of trust and comfort is clearly connected. Dr. Rosenblum further testified to a reasonable degree of psychological certainty that termination met [Child's] needs and welfare. [Child] does not look to Mother as the individual he can rely on to meet his emotional needs. Moreover, […] not visiting with Mother would

- 11 -

not appear to have any adverse impact on [Child], as [Child] has spent the most vital years of his attachment period with his foster parents and has lived his entire life out of Mother's care. Yet, were [Child] to be removed from his foster parents, it appears that he would suffer "a major emotional trauma."

Orphans' Court Opinion, 9/8/2015, at 9.

We again conclude that the orphans' court did not abuse its discretion. The testimony of Dr. Rosenblum was corroborated by that of CYF caseworker Walter, who testified that Child has resided with his pre-adoptive foster parents since being adjudicated dependent in December of 2012. N.T., 7/1/2015, at 63-64, 68. While he recognizes Mother and interacts with her appropriately, he has never had unsupervised contact with Mother. *Id.* at 68-69. Child is bonded with his foster parents, he looks to his foster parents to meet his daily needs and he is thriving in their care. *Id.* Mr. Walter opined that Child's best interest would be served by terminating Mother's parental rights, so that he can be adopted by his foster parents. *Id.* at 64.

Thus, the record supports the conclusion of the orphans' court that it would best serve Child's needs and welfare to terminate Mother's parental rights. Allowing Mother to preserve her parental rights would deny Child the opportunity for permanence and stability. No relief is due.

Finally, Mother argues that the orphans' court erred in failing to recuse itself from the termination proceeding. Mother's Brief at 19-20.

> Generally, a party must seek to have a judge recused from a case, by first bringing the petition for recusal before that jurist, thus enabling the judge to evaluate the reasons for recusal firsthand. This is, in part, to allow the requested judge to state

- 12 -

his or her reasons for granting or denying the motion and, as the allegedly biased party, to develop a record on the matter. The final determination by that judge may then be reviewed by an appellate court, but may only be reversed upon an abuse of discretion.

*In re Adoption of L.J.B.*, 18 A.3d 1098, 1112 (Pa. 2011) (citations and quotations omitted). "We recognize that our trial judges are 'honorable, fair and competent,' and although we employ an abuse of discretion standard, we do so recognizing that the judge [her]self is best qualified to gauge [her] ability to preside impartially. Hence, a trial judge should grant the motion to recuse only if a doubt exists as to his or her ability to preside impartially or if impartiality can be reasonably questioned." *In re A.D.*, 93 A.3d 888, 892 (Pa. Super. 2014).

On appeal, Mother contends that the orphan's court "denied the first TPR petition filed against Mother … reluctantly and visibly expressed [its] unhappiness with [the] decision saying that CYF could have prevailed." Mother's Brief at 19.[3] Mother further contends that the court's familiarity

---

[3] Mother's issue on appeal differs from that argued during the January 30, 2014 hearing on her motion to recuse. At that time, counsel for Mother indicated that the basis for the motion was statements made by the court during a November 14, 2014 permanency review hearing involving Mother's older children. N.T., 1/30/2015, at 6-8. Counsel stated that a colleague of his was present at the hearing on Mother's behalf and believed the court was advising CYF "how to present their case at [Mother's] next TPR hearing." *Id.* at 7. These comments prompted the other attorney to seek a recusal, which was denied. *Id.* Mother has failed to provide this Court with a transcript of the November 14, 2014 hearing at issue, or a statement in lieu of that transcript as prescribed in Pa.R.A.P. 1923. Accordingly, to the extent that Mother relies on this transcript in her argument, this issue is waived. *In re G.T.*, 897 A.2d 1197, 1199 (Pa. Super. 2006) ("Absent a re-creation of the

with, and negative opinions of, Mother's family affected the partiality of her decision in this matter. *Id.*

The court addressed Mother's issue as follows.

As the party seeking recusal, Mother had the burden to prove that [the court] exhibited some form of "bias, prejudice or unfairness" that rendered [it] incapable of presiding impartially. The only evidence which Mother can point to of [the orphans' court's] alleged bias is that [it] appeared to have "demonstrated express displeasure" in not terminating her rights at the first TPR hearing, that [it] had the "express intention" to terminate her rights at the subsequent TPR hearing, and was swayed by [its] knowledge of extra-judicial information regarding Mother's family.

With respect to Mother's first argument, [the court] did not express displeasure in not being able to terminate Mother's rights at the first TPR hearing. [It] merely denied making a finding in favor of Mother. Because denial of the first petition was used affirmatively in the [siblings'] case, [the court] simply commented that CYF did not establish grounds for termination, but that the petition was not denied due to any actions or efforts by Mother to improve her situation. [The court's] comment in no way signified any degree of displeasure or bias towards Mother.

In response to Mother's second and third arguments, Mother has failed to demonstrate any evidence that [the court] intended to terminate her rights prior to the second hearing, other than her belief that [the court] allowed extra-judicial knowledge of her family to impact [its] impartiality. As [the court] stated at the motions hearing on January 30, 2015, despite all of the information that [it] was aware of during the first termination hearing, [it] denied CYF's petition, finding the agency did not did not establish grounds for termination. Furthermore, all of the information … learned about Mother's family was obtained in [the court's] role as a jurist and not from any "pretrial bias or personal disdain." Contrary to Mother's belief, trial judges are

---

content of the alleged missing transcript, it is as if the transcript was not filed. Under those circumstances, adequate appellate review is not possible without such crucial testimony.").

capable of "disregarding inadmissible evidence and considering only competent evidence."

Orphans' Court Opinion, 9/8/2015, at 10-11 (citations omitted).

We discern no abuse of discretion in the orphans' court's decision to deny Mother's motion. Put simply, Mother has failed to meet her burden of establishing that the court's comment was evidence of "bias, prejudice or unfairness which raises a substantial doubt as to the jurist's ability to preside impartially." *In re A.D.*, 93 A.3d at 894. Moreover, we recognize, and the orphans' court aptly notes, that the court's familiarity with Mother's family is a necessary result of the one-judge/one-family system employed by Allegheny County and the court's apprehension about allowing Mother, and Child, to be involved with Mother's family is not in and of itself evidence of bias.

Accordingly, because we conclude that the orphans' court did not abuse its discretion by terminating Mother's parental rights to the Children involuntarily, we affirm the order of the orphans' court.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/29/2016