J-S35032-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.G.-M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: O.G., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 830 MDA 2023 |

Appeal from the Order Entered May 1, 2023
In the Court of Common Pleas of Lebanon County Orphans' Court at
No(s):  2023-01

BEFORE:   PANELLA, P.J., McLAUGHLIN, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:                **FILED FEBRUARY 09, 2024**

O.G. ("Father") appeals from the May 1, 2023 order of the orphans' court terminating his parental rights to A.G.-M., born in December 2018 ("Child" or "Minor Child").  After careful review, we affirm.

Child first came into custody of Lebanon County Children and Youth Services (the "Agency") on September 8, 2020 when A.M. ("Mother") was suspected of being under the influence of controlled substances while caring for Child.  At that time, Father was incarcerated in New York state.  Mother was arrested and charged, *inter alia*, with endangering the welfare of a child as a result of the September 8, 2020 incident.  Child was adjudicated dependent on October 5, 2020, and has remained in the same, pre-adoptive foster home for the duration of this case.

_____

[*] Retired Senior Judge assigned to the Superior Court.

The Agency filed the petition to involuntarily terminate Father and Mother's parental rights on January 25, 2023, raising grounds for termination under Sections 2511(a)(1), (2), (5), (8) and (b) of the Adoption Act.[1]  23 Pa.C.S. § 2511(a)(1), (2), (5), (8), (b).  Hearings were held on the petition on February 6, April 3, April 17, and May 1, 2023.  At the hearings, the following witnesses testified: the Agency caseworker; a psychologist who conducted a parenting capacity assessment of Mother; a special education teacher who conducts weekly sessions with Child; Child's pre-kindergarten instructor; a parent educator who worked with Mother; Child's foster mother; Father; Father's cousin; and Mother.

The orphans' court summarized the evidence presented at the termination hearings that is relevant to this appeal:

> Minor Child is a four-year- old child who . . . has special needs due to autism. [Exhibit 3; ]N.T., 2/6/23[], at 24, 29, 37, 71; []N.T., 4/3/23[], at 32.  Father is the natural father of Minor Child and is a forty-eight-year-old man [].  Exhibit 3.  []Mother[] is the natural mother of Minor Child and is a thirty-two-year-old woman [].  Exhibit 3; []N.T., 5/1/23[], at 5.  . . .
>
> . . . [At the review hearings held on March 10, August 5, and December 20, 2021 and July 25, 2022, it was reported that] Father had moderate compliance with his goals.  N.T., 2/6/23, at 60[, 62].  Father [was] incarcerated [at the time of the first termination hearing].  N.T., 2/6/23, at 62.  [In the period between

---

[1] Child was represented by legal interests counsel, as well as a separate guardian *ad litem* ("GAL"), in the termination proceedings.  ***See In re Adoption of K.M.G.***, 240 A.3d 1218, 1235 (Pa. 2020) (holding that appellate courts should engage in *sua sponte* review to determine if orphans' court appointed legal interest counsel to represent children in contested termination proceedings).

the first and second hearing, Father was deported to El Salvador. N.T., 4/3/23, at 107; N.T., 4/17/23, at 28, 48.]

. . . Father had the following twelve goals [established by the Agency to achieve reunification with Child]:

1. Will cooperate with the Agency and follow all recommendations.

2. Will sign all necessary documentation required by the Agency, including releases.

3. Will inform the Agency of any address, phone number, or household member change within twenty-four hours of the change.

4. Will pay child support as directed by the Domestic Relations Office.

5. Will obtain a drug and alcohol evaluation and follow all recommendations.

6. Will participate in a mental health evaluation and follow all recommendations.

7 Will cooperate with mental health service providers and participate in all sessions of recommended services until successfully discharged.

8. Will participate in an Agency approved parenting program until successful completion and follow all recommendations.

9. Will maintain a life free from crime.

10. Will visit regularly with Minor Child.

11. Participate in Minor Child's services (occupational therapy, speech therapy, individual therapy, IBHS) through all providers (PA Counseling, IU13, etc.).

12. Participate in parenting course/education for parents of children with autism.

Exhibit 3; Exhibit 13[; N.T., 2/6/23, at 72; N.T., 4/3/23, at 115].

. . . Father did make progress on completing his goals . . . N.T., 2/6/23, at 60, 62[]. Father's ability to complete his goals was hindered by his incarceration and subsequent deportation. Exhibit 6, 11; N.T., 2/6/23, at 73. Father is trying to return to the United

States [via a "U Visa," which is offered when an individual is a victim of a crime in the United States]. N.T., 4/17/23, at 28-29. [The alleged crime that would support the visa application occurred while Father was incarcerated in the federal detention facility. N.T., 4/17/23, at 29. According to Father, the visa application is currently under investigation, and he could return to the United States within one year of the date of his testimony. *Id.* at 28-29, 47-48.]

Father was moderate in following recommendations by the Agency. However, the Agency notably did have issues with getting Father to even agree to have Minor Child receive a haircut, and a court order became necessary. N.T., 2/6/23, at 61[; N.T. 4/17/23, at 55-61]. Father [has provided the] Agency [with requested information] sometimes but not other times. N.T., 4/3/23, at 107-08, 116, 124-25; N.T., 2/6/23, at 73. Father offered some kinship options which the Agency explored. N.T., 2/6/23, at 58-59. Unfortunately, the kinship options were not sufficient or appropriate. []N.T., 4/3/23, at 108-10; N.T., 2/6/23, at 82-84.

While incarcerated, Father did not complete and was not able to undergo drug and alcohol evaluation because he was out of state and did not have any drugs in his system when he was arrested. N.T., 2/6/23, at 73-74, 79-80. Father has a history of drug-related offenses. N.T., 2/6/23, at 79. Additionally, Father was unable to complete a parenting class because, even though he put in a request, there was no parenting program at the facility. N.T. 4/17/23, at 34; N.T., 2/6/23, at 74. Father has not been able to participate in any sort of services for Minor Child's autism due to his incarceration. N.T., 4/17/23, at 36[-37]; N.T., 2/6/23, at 75. Father has not been able to participate in any sort of parenting classes due to his incarceration. N.T., 2/6/23, at 75. Father was incarcerated since Minor Child was about two months old. N.T., 2/6/23, at 74.

Conversely, Father completed a mental health evaluation and followed the recommendations provided. N.T., 2/6/23, at 74. Father also completed anger management at the correctional facility in 2019. N.T., 2/6/23, at 74. Father participated in vocational training while incarcerated. N.T., 4/17/23, at 34. Father seemed interested in Minor Child's autism and about services for it. N.T., 2/6/23, at 76. Father contacted the Agency about Minor Child's medical issues regarding his autism; Father was concerned perhaps he was not in the right services. N.T.,

2/6/23, at 78-79. Father was concerned about Minor Child receiving proper care and services because he wants what is best for his son. N.T., 4/17/23, at 12-13. Father was interested in ensuring Minor Child's special needs were being addressed. N.T., 4/3/23, at 126.

The Agency communicated with Father about his goals over the phone. N.T., 2/6/23, at 76. Father received the Child Permanency Plan from the Agency. N.T., 4/17/23, at 50. While the Agency provided Mother with services, there was not really much the Agency could put into place to help Father due to his incarceration out of state. []N.T., 2/6/23, at 76. In the last six months prior to the filing of the petition, from July of 2022 to January of 2023, all Father could really do was make phone calls with Minor Child. N.T., 2/6/23, at [77-]78.

Lastly, Father's visitation was through phone calls[ or video calls facilitated by the Agency, once or twice per] week. N.T., 4/3/23, at 75[, 114]; N.T., 2/6/23, at 68, 74[; N.T., 4/17/23, at 29]. Father asked for more calls. N.T., 4/17/23, at 29. There were some phone calls that went well. N.T., 4/3/23, at 92. Father seemed to speak appropriately to Minor Child about Minor Child's interests. N.T., 4/3/23, at 92. Father seemed to be interested in Minor Child's well-being. N.T., 4/3/23, at 92. Father would ask Minor Child how he was, what he ate, about school, about friends and favorite toys, and about family during calls. N.T., 4/17/23, at 37[-38]. However, sometimes Minor Child did not engage much with Father throughout unless significantly prompted; Minor Child preferred to play with his toys and to see his foster mom. N.T., 4/3/23, at 115.

Many calls did not go well, and Minor Child would wait about one or two minutes and then run to the other end of the room to do something else. N.T., 4/17/23, at 52; N.T., 2/6/23, at 75. The Agency would put the phone on speaker and try to encourage Minor Child to speak with Father. N.T., 2/6/23, at 75. If Father asked anything, Minor Child would yell "stop[."] N.T., 2/6/23, at 75. Minor Child did not seem to have a clue who was on the phone. N.T., 2/6/23, at 75. Father refers to himself as "Papa[,"] but Minor Child refers to Father [by his first name] if he uses a name at all. N.T., 2/6/23, at 75. Minor Child would also sometimes press a red hang-up button because he did not want to talk. N.T., 4/17/23, at 52; N.T., 4/3/23, at 75. He also would sometimes throw the cellphone into another room and state he did not want to talk. N.T., 4/3/23, at 75. Minor Child has hidden

under the kitchen table yelling stop. N.T., 4/3/23, at 75. He also put the cellphone underneath a couch cushion while Father was talking to him. N.T., 4/3/23, at 75. Additionally, sometimes Minor Child would simply sit there and just not talk. N.T., 4/17/23, at 52; N.T., 4/3/23, at 75.

This Court notes that Minor Child is "potty-trained." N.T., 4/3/23, at 37, 76. However, Minor Child [would] "go to the bathroom" upon himself before, during, and after visitation but not at other times, and Minor Child will not nap after visits. N.T., 5/1/23, at 39-41[]; N.T., 4/17/23, at 51-52; N.T., 4/3/23, at 37-38, 78[]. Additionally, Minor Child acted poorly and somewhat violently at pre-kindergarten after having visitation. Exhibit 8; Exhibit 14; N.T., 4/3/23, at 34-36. Minor Child also had poor behavior prior to visits if he knew about them. N.T., 4/3/23, at 52. Minor Child's poor behavior related to visits has gotten worse with time. N.T., 4/3/23, at 41. While Minor Child has exhibited some poor behavior on days without visitation as well, the "potty" issues were more closely related than the poor behavior to visits. N.T., 4/3/23, at 49-51. Notably, when Minor Child attends other appointments and returns to pre-kindergarten, he does not exhibit the poor behavior like he does after visits. N.T., 4/3/23, at 53. Lastly, Minor Child has had trouble sleeping and clings to foster mom for comfort to fall asleep. Exhibit 9; N.T., 4/3/23, at 79-80. It seems that Father and Mother talking about taking Minor Child to California during visitation appears to have triggered his behavior. N.T., 4/3/23, at 88. This Court also notes that Father has a negative relationship, if any, with foster mom. N.T., 4/3/23, at 84. Phone calls with Father went from being in the foster home to the courthouse because Father was being very disrespectful. N.T., 4/3/23, at 74-75, 85-86.

Father feels like he has a bond with Minor Child. N.T., 4/17/23, at 40. Father desires to be with his son. N.T., 4/17/23, at 44. Father sent some gifts while he was incarcerated. N.T., 4/17/23, at 36. Father gave Minor Child a "Transformer" toy for a Christmas gift. N.T., 4/3/23, at 125; N.T., 2/6/23, at 78. Father sent a picture that he drew for Minor Child. N.T., 2/6/23, at 59. Minor Child knows when the gifts are from Father. N.T., 4/3/23, at 96. Minor Child sometimes wears gifts from Father and seems to appreciate the multiple gifts Father provided. N.T., 4/3/23, at 95-96. Minor Child has also provided some return gifts to Father. N.T., 4/3/23, at 96. . . . [Notwithstanding Father's efforts], the Agency caseworker testified that Minor Child does not have bond with Father. N.T., 2/6/23, at 79. [] The Agency caseworker also

testified that it would be in the best interest of Minor Child to terminate Father's parental rights. N.T., 2/6/23, at 84.

Conversely, Minor Child has a very strong and positive bond with the foster family. N.T., 4/3/23, at 54-55. [Child has been in the same foster home for his entire time in placement. N.T., 2/6/23, at 57.] Minor Child calls the foster mother "Mom[,"] the foster father "Dad[,"] Father [by his first name], and Mother "Mommy A[_____," using her first name]. N.T., 4/3/23, at 84; N.T., 2/6/23, at 84. Minor Child needs permanency and has been with the foster family his whole time in placement and longer than his biological family. []N.T., 2/6/23, at [] 57. Minor Child shares a room with another foster child at his foster home. N.T., 2/6/23, at 84. He is very comfortable there. N.T., 2/6/23, at 84. The foster family provides stability and permanency for him. N.T., 2/6/23, at 84.

The foster mother participated in Minor Child's special education with him and his teacher[]. N.T., 4/3/23, at 5, 13. The foster family followed a recommendation to use the same reward system at home that the daycare uses to help address Minor Child's needs. N.T., 4/3/23, at 8, 73-74. Minor Child is also typically very happy with the pre-kindergarten, and he loves to play with his friends and to interact. N.T., 4/3/23, at 31. He loves to help, is very energetic, and tries new things. N.T., 4/3/23, at 31-32.

The foster family is an adoptive resource for Minor Child. N.T., 4/3/23, at 83. The foster family would like to keep Mother involved in Minor Child's life. N.T., 5/1/23, at 52. Additionally, the foster mother stated that, if they adopt[] Minor Child, then they would continue to have contact with Father and Mother, especially Mother[,] as long as it was in Minor Child's best interest. N.T., 4/3/23, at 84-85.

Orphans' Court Opinion, 7/21/23, at 3-10.

On May 1, 2023, the orphans' court entered an order involuntarily terminating both Father and Mother's parental rights. Father filed a timely notice of appeal and concurrently filed a concise statement of errors

complained of on appeal, as required by Pa.R.A.P. 1925(a)(2)(i).[2] On July 21, 2023, the orphans' court filed an opinion pursuant to Pa.R.A.P. 1925(a), in which the court stated that the Agency had established grounds for termination of Father's parental rights under Section 2511(a)(1) and (2) and under subsection (b).

Father presents the following issues for our review: "Did the Court err in involuntarily terminating the parental rights of Appellant, Father?" Father's Brief at 2. While Father only raises one appellate issue, he challenges the orphans' court's determination that termination of his parental rights was appropriate under subsections (a) and (b) of Section 2511.

We conduct our review in light of the following:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In the Interest of J.R.R.*, 229 A.3d 8, 11 (Pa. Super. 2020) (quoting *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013)).

---

[2] Mother did not appeal from the May 1, 2023 termination order. Orphans' Court Opinion, 7/21/23, at 3-4.

The burden is on the petitioner in the lower court to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In the Interest of L.W.*, 267 A.3d 517, 522 (Pa. Super. 2021). The clear and convincing evidence standard is defined as "testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* (citation omitted).

Under Section 2511 of the Adoption Act, the orphans' court must first determine whether the particular conduct of a parent warrants involuntary termination of their parental rights under any one of the eleven grounds enumerated in subsection (a). 23 Pa.C.S. § 2511(a)(1)-(11); *T.S.M.*, 71 A.3d at 267; *In re Adoption of C.M.*, 255 A.3d 343, 359 (Pa. 2021). If the orphans' court determines that the petitioner established grounds for termination under Section 2511(a) by clear and convincing evidence, the court then must proceed to assess the petition under subsection (b), which focuses on the child's needs and welfare. 23 Pa.C.S. § 2511(b); *T.S.M.*, 71 A.3d at 267.

Here, the orphans' court terminated Father's parental rights pursuant to Sections 2511(a)(1) and (2), and subsection (b). However, this Court may affirm the court's decision to terminate if we agree with its determination concerning any one subsection of Section 2511(a), as well as Section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). We focus our analysis on Section 2511(a)(2) and (b), which provide as follows:

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\*　　　\*　　　　\*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*　　　\*　　　　\*

**(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. . . .

23 Pa.C.S. § 2511(a)(2), (b).

Under Section 2511(a)(2), "the moving party must prove by clear and convincing evidence that there is (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re Adoption of L.A.K.*, 265 A.3d 580, 600 (Pa. 2021).

[S]ubsection (a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control[,] or subsistence necessary for his physical or mental well-being. Therefore, the language in subsection (a)(2) should not be read to compel courts to ignore a child's need for a stable home and strong, continuous parental ties, which the policy of restraint

- 10 -

in state intervention is intended to protect. This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it.

*In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010) (citation and emphasis omitted).

The grounds for termination under Section 2511(a)(2) are not limited to affirmative misconduct but also include parental incapacity that cannot be remedied. *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021). "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *Id.* "[W]hen a parent has demonstrated a continued inability to conduct his . . . life in a fashion that would provide a safe environment for a child, whether that child is living with the parent or not, and the behavior of the parent is irremediable as supported by clear and competent evidence, the termination of parental rights is justified." *Z.P.*, 994 A.2d at 1118 (citation omitted).

In its opinion, the orphans' court stated that, despite Child having been in placement for approximately 32 months as of the date of the last termination hearing and the Agency having devoted substantial resources to assist Father, he had only made moderate progress towards completing the case goals put forth by the Agency. Orphans' Court Opinion, 7/21/23, at 16, 18. The court noted that "a lot of important goals remained incomplete," and that Father "refused to put in the effort necessary to comply with the goals and recommendations." *Id.* at 16, 18-19. The court expressed its "biggest concern" with Father's inability to effectively conduct visitation with Child,

- 11 -

resulting in Child's avoidance of Father during video or telephonic visits and poor behavior before and after the visits, including an inability to nap, violent behavior in pre-kindergarten, and bathroom accidents. *Id.* at 16-18, 21. The courted noted that Child's poor behavior during visits was in part triggered by Father's discussion of taking Child to California for vacation. *Id.* at 17. The court additionally highlighted that Father refused to consent to Child's receipt of a haircut, which required hearings and a court order to ultimately procure the haircut, and the fact that Father did not consistently keep the Agency informed of his status and whereabouts. *Id.* at 17-18.

The court observed that Father's incapacity was based in large part upon his incarceration, which "inhibited his ability to parent and to complete" the goals set out by the Agency. *Id.* at 18. Nevertheless, the court noted that "Father's incarceration was his own fault," and "Father was not able to have appropriate visitation when given the chance" during his period of imprisonment. *Id.* The court additionally stated that Father's recent deportation will mean that Father will continue to be unable to provide Child with ongoing essential parental care, control, and subsistence. *Id.* at 18.

In this Court, Father argues that the Agency did not raise Section 2511(a)(2) as grounds for termination in the termination petition and instead the Agency only proceeded under Section 2511(a)(1), (5), and (8). Father's Brief at 3, 10-12. As the orphans' court determined that the Agency did not meet its burden under subsections (a)(5) and (8), Orphans' Court Opinion, 7/21/23, at 15, Father contends that the court could only proceed under

subsection (a)(1) and the purported grounding in the decision to terminate on subsection (a)(2) was in error. Father's Brief at 10-12. Father accordingly solely addresses whether termination was appropriate under subsections (a)(1) and (b). *Id.* at 10-11.

We disagree with Father that the Agency did not raise subsection (a)(2) as grounds for termination. While the Agency in the termination petition imprecisely located the discussion of subsection (a)(2) as a sub-paragraph within the discussion more broadly applicable to subsections (a)(5) and (8), Termination Petition, 1/25/23, ¶¶18, 18(h), the citation to Section 2511(a)(2), as well as the required proof under that subsection, are clearly set forth in the petition. *Id.* ¶18(h). We further note that Father has not raised any argument that he was deprived of the opportunity to present evidence or to respond to the Agency's evidence at the hearings based upon his claim that subsection (a)(2) was not a valid basis for termination. Instead, Father simply ignores the relevant language in the termination petition concerning subsection (a)(2), as well as any discussion of the orphans' court's analysis on this issue and focuses his entire Section 2511(a) argument on subsection (a)(1). After our close reading of the text of the termination petition, we decline to do the same.

Turning to the question of whether the Agency presented sufficient evidence to prove by clear and convincing evidence that Father's parental rights to Child should be involuntarily terminated under Section 2511(a)(2), we conclude that the Agency has met its exacting burden in this case. The

record supports the Agency's conclusion that Father was not able to satisfy many of the goals established by the Agency, such as a drug and alcohol evaluation and parenting classes, based in large part upon Father's incarceration outside of Pennsylvania for the majority of the pendency of this case. While Father readily participated in telephonic or video visitation that the Agency arranged, these visits were generally not beneficial for Child. Child often failed to communicate with Father during the calls, either ignoring him entirely, running out of the room and hiding from the phone, or hanging up on Father. Child also engaged in violent behavior directly before or after visits, his sleep schedule was disturbed by the visits, and he often went to the bathroom on himself despite being potty trained. Father's behavior had other negative effects on Child, such as when he refused to consent to have Child's long hair cut, despite the discomfort this caused Child as a result of his sensory issues. N.T., 2/6/23, at 61; N.T. 4/17/23, at 55-61.

The record additionally supports the orphans' court's finding that the principal contributor to Father's incapacity to provide Child with essential parental care was based upon Father's incarceration, notwithstanding Father's clear interest in Child's well-being. Father was initially arrested in February 2019—two months after Child's birth and seven months before Child was removed from the home—and he remained in detention in New York state correctional facilities and in an immigration facility until he was deported in March 2023. N.T., 2/6/23, at 62, 73; N.T., 4/3/23, at 107; N.T., 4/17/23, at 30, 46.

While the fact of a parent's incarceration by itself is insufficient to support termination under Section 2511, this Court has explained that "incarceration will certainly impact a parent's capability of performing parental duties[] and may render a parent incapable of performing parental duties under subsection (a)(2)." *In the Interest of K.M.W.*, 238 A.3d 465, 474 (Pa. Super. 2020) (*en banc*) (citation omitted); *see also In re A.D.*, 93 A.3d 888, 897 (Pa. Super. 2014). Our Supreme Court has stated that "incarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under [Section] 2511(a)(2) where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied." *In re Adoption of S.P.*, 47 A.3d 817, 828 (Pa. 2012); *see also In re D.C.D.*, 105 A.3d 662, 677 (Pa. 2014). "Each case of an incarcerated parent facing termination must be analyzed on its own facts, keeping in mind . . . that the child's need for consistent parental care and stability cannot be put aside or put on hold." *K.M.W.*, 238 A.3d at 474 (citation omitted).

Father's incarceration during this case led to him being unable to complete various Agency goals, including attending parenting classes and complete a drug and alcohol evaluation, and also precluded Father from visiting Child in person or attending his medical or educational appointments. Effectively, Father's only opportunity to provide Child with essential parental care and stability was through the telephone and video visits, which, as

described above, often had negative affects that outweighed any positives. Therefore, we conclude that the orphans' court properly considered Father's incarceration as a significant factor in Father's incapacity to provide Child with essential parental care under Section 2511 (a)(2). *See S.P.*, 47 A.3d at 831 (holding that trial court appropriately found that a parent's incarceration since prior to the child's birth and throughout the duration of the case caused the child to be without essential care, control, or subsistence).

While Father is no longer incarcerated, he now faces an additional obstacle to his ability to parent Child based upon his deportation to El Salvador in March 2023. N.T., 4/3/23, at 107; N.T., 4/17/23, at 28. We are aware of no published case law addressing a parent's deportation from the United States as a cause of parental incapacity under subsection (a)(2). However, where a term of incarceration extends beyond the date of the termination hearing, our Supreme Court has held that "the length of the remaining confinement can be considered as highly relevant to whether 'the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent,' sufficient to provide grounds for termination pursuant to [Section] 2511(a)(2)." *S.P.*, 47 A.3d at 830 (quoting 23 Pa.C.S. § 2511(a)(2)); *see also D.C.D.*, 105 A.3d at 677. In *S.P.*, the Court determined that the trial court properly found that the uncertainty of the parent's parole date and the fact that he would be required to reside in a half-way house and subsequently complete various required agency services demonstrated that the causes of the parental incapacity could not be remedied

under subsection (a)(2). 47 A.3d at 831. In **D.C.D.**, the Court concluded that the trial court did not abuse its discretion in determining that an incarcerated parent was incapable of curing his incapacity as a parent when his minimum release date was not until five years beyond the date of the termination hearing. 105 A.3d at 677. Similarly, this Court held that a parent subject to an out-of-state no-contact order banning contact with the subject child based upon probable prior abuse is analogous to long-term imprisonment for the purpose of determining parental incapacity under Section 2511(a)(2) and that the "causes of [the parent's] parenting incapacity cannot be remedied as long as the no-contact order remains in place." **In re A.D.**, 93 A.3d 888, 896-97 (Pa. Super. 2014).

We conclude that Father's deportation to El Salvador is also analogous to an indefinite term of imprisonment as he is prevented from having any in-person contact with Child in the United States and therefore Father cannot provide the essential parental care, control, and subsistence that Child requires. As in **D.C.D.**, **S.P.** and **A.D.**, Father's indefinite ban from returning to the United States as a result of his deportation results in him being unable to remedy his incapacity as a parent. **D.C.D.**, 105 A.3d at 677; **S.P.**, 47 A.3d at 431; **A.D.**, 93 A.3d at 896-97. While Father testified that he has applied for a "U-Visa" to return to the United States based upon his status as a victim of a crime in this country and that the visa **could** be granted within as little as one year, N.T., 4/17/23, at 28-29, 47-48, Father's hope to reenter the United States on the U-Visa and be an available resource for Child is

"speculative at best," and he is no better a situation than a prisoner facing a lengthy sentence with no definitive prospect for an imminent release. *S.P.*, 47 A.3d at 430-31 (citation omitted). We may not "subordinate indefinitely [C]hild's need for permanence and stability" based upon Father's "hope for the future" of a potential reentry to the United States and reunification with Child. *In the Matter of M.P.*, 204 A.3d 976, 983 (Pa. Super. 2019) (citation omitted); *see also K.M.W.*, 238 A.3d at 474 ("Parental rights are not preserved by waiting for a more suitable [] time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.") (citation omitted).

Accordingly, we find that the orphans' court did not abuse its discretion in concluding that Father had a continuing incapacity to provide Child with essential care, control, and subsistence and that this incapacity could not be remedied. 23 Pa.C.S. § 2511(a)(2); *L.A.K.*, 265 A.3d at 600. As the Agency demonstrated an adequate ground for termination under Section 2511(a)(2), we must proceed to address whether the lower court properly found that termination was warranted under Section 2511(b), which requires the court to "give primary consideration to the development, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). As under Section 2511(a), the party seeking termination must prove by clear and convincing evidence that termination best serves the child's needs and welfare pursuant to subsection (b). *In the Interest of K.T.*, 296 A.3d 1085, 1105, 1114 (Pa. 2023).

"The emotional needs and welfare of the child have been properly interpreted to include intangibles such as love, comfort, security, and stability."  **T.S.M.**, 71 A.3d at 267 (citation and quotation marks omitted); **see also K.T.**, 296 A.3d at 1106.  "Notably, courts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent."  **K.T.**, 296 A.3d at 1105.

Beginning with **In re E.M.**, 620 A.2d 481 (Pa. 1993), our Supreme Court has consistently mandated that any Section 2511(b) analysis "requires consideration of the emotional bonds between the parent and child."  **T.S.M.**, 71 A.3d at 267.  Specifically, "[c]ourts must determine whether the trauma caused by breaking [the parent-child] bond is outweighed by the benefit of moving the child toward a permanent home."  **Id**. at 253 (cleaned up).  The recognized threshold for this required bond inquiry is whether termination will sever a "necessary and beneficial relationship," causing the child to suffer "'extreme emotional consequences' or significant, irreparable harm."  **K.T.**, 296 A.3d at 1109-10 (quoting **E.M.**, 620 A.2d at 484).  "However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists."  **In re Adoption of A.H.**, 247 A.3d 439, 445 (Pa. Super. 2021) (citation omitted).  "Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case."  **Id.** (citation omitted).

"[A] court conducting the Section 2511(b) needs and welfare analysis must consider more than proof of an adverse or detrimental impact from severance of the parental bond." **K.T.**, 296 A.3d at 1113. Our Supreme Court has explained that the court should consider, as appropriate, the child's need for permanency and length of time in foster care, the child's placement in a pre-adoptive home and whether there is a bond with the foster parents, and whether the foster home meets the child's developmental, physical, and emotional needs. **Id.** Nonetheless, there is no "exhaustive list" of factors that must be considered by an orphans' court in this context. **Id.** at 1113 n.28.

Father argues that the orphans' court erred in its analysis under Section 2511(b), contending that he has a strong bond with Child as demonstrated by Father's testimony that Child makes drawings of him and Father together during visits and that Child says that his natural parents are his best friends. N.T. 4/17/23, at 41, 53. Father additionally argues the Agency should have undertaken greater efforts to place Child with the various kinship resources he suggested within his extended family. Finally, Father contends that the court did not give due consideration to the fact that the Agency failed to provide him with training on how to parent an autistic child.

We find no cause to disturb the orphans' court's determination pursuant to Section 2511(b) that termination of Father's parental rights would best serve the needs and welfare of Child. In its opinion, the orphans' court found that Father did not maintain sufficient visitation with Child in order to maintain

the parent-child bond. Orphans' Court Opinion, 7/21/23, at 19. Further, the court determined that the visits, on the whole, were detrimental to Child's physical and mental well-being, as most plainly evidenced by Child's bathroom accidents. *Id.* The orphans' court concluded that Father does not appear to have a bond with Child, and, even if one exists, the bond is not necessary or beneficial to Child. *Id.*

The orphans' court further determined that Child's developmental, physical, and emotional needs were "being addressed better by the foster parents" who are an adoptive resource for Child. *Id.* at 20-21. The court explained that Child calls his foster parents "Mom" and "Dad" as opposed to his natural parents who he called by their first names. *Id.* at 19-20. The court noted that foster parents provide stability and permanency for Child because he has been with that family during his entire time in placement—approximately 32 months as of the date of the court's decision—and longer than his biological family. *Id.* at 20. The court stated that Child shares a room with another foster child in his foster home and he is very comfortable in that home. *Id.* Further, the court recognized that foster mother participated in Child's special education program with his teacher, Child is happy in the school environment, and that the foster family has incorporated the reward system used at school into Child's home routine. *Id.*

The orphans' court's findings with respect to Section 2511(b) are supported by competent evidence. Moreover, the lower court properly addressed under our caselaw not only whether there exists a bond between

Father and Child and the effect of severing such a bond but also Child's relationship with his foster parents, the duration of his placement in foster care, and whether the foster home meets his developmental, physical, and emotional needs. *K.T.*, 296 A.3d at 1113. Father argues that he has a positive bond with Child as shown by their interactions during the visits, yet there is ample countervailing evidence to show that, while Father and Child have some form of a relationship, the bond between them was minimal, if any,[3] and that Child's behavior surrounding the visits demonstrated that the parent-child bond was not beneficial and its severance would not harm Child.

Father's remaining arguments with respect to Section 2511(b) focus on the Agency's actions rather than the Child's needs and welfare. *K.M.W.*, 238 A.3d at 473 (focus under Section 2511(b) is on the interests of the child). Nevertheless, we note that, while Father contends that the Agency should have made greater efforts to provide him with training to parent an autistic child, the fact remains that Father was confined in New York detention facilities or residing in El Salvador for the duration of this case and therefore the Agency was limited in the services it could offer. Finally, the record shows that the Agency explored the various kinship resources that Father offered, but they were determined to be not suitable or appropriate. N.T., 2/6/23, at 58-59, 82-84; N.T., 4/3/23, at 108-10.

_____

[3] We note, in particular, that the Agency caseworker testified that Father and Child do not share a bond. N.T., 2/6/23, at 79.

Accordingly, we find no abuse of discretion or error of law in the orphans' court's determination under Section 2511(b). We therefore affirm the court's order involuntarily terminating Father's parental rights to Child pursuant to Section 2511(a)(2) and (b).

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 02/09/2024