J-S03001-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: L.D.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.C.M., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1617 MDA 2025 |

Appeal from the Order Entered October 29, 2025
In the Court of Common Pleas of Cumberland County Orphans' Court at
No(s): 29-Adopt-2025

| | | |
|---|---|---|
| IN THE INTEREST OF: R.S.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.C.M., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1618 MDA 2025 |

Appeal from the Order Entered October 29, 2025
In the Court of Common Pleas of Cumberland County Orphans' Court at
No(s): 030 Adopt 2025

BEFORE:  DUBOW, J., BECK, J., and LANE, J.

MEMORANDUM BY DUBOW, J.:                    **FILED: APRIL 15, 2026**

Appellant, A.C.M. ("Father"), appeals from the October 29, 2025 orders that granted the petitions filed by E.L.H. ("Mother") and terminated his parental rights to Mother and Father's four-year-old child, L.D.M., and three-year-old child, R.S.M. (collectively, "Children").  Upon review, we affirm.

The following factual and procedural history is relevant to this appeal. Father has a history of domestic violence and alcohol abuse.  Mother and

Father never married but were in a romantic relationship for approximately six years and lived together in the home of Mother's parents until April 2023, when an incident occurred that prompted Mother to obtain a final protection from abuse ("PFA") order against Father on behalf of herself and Children. In April 2023, when Children were approximately 2 years old and 5 months old, respectively, they were asleep in Mother and Father's bedroom with Mother. There were various reptile tanks in the bedroom. Father entered the bedroom and slammed the door so hard that it jammed, locking all four in the room. Father became enraged and began throwing the reptile tanks around the room, which smashed the television. He then stabbed the bedroom door with a knife in an attempt to open it but was unsuccessful. Father proceeded to hit Mother in the face with the knife, resulting in a cut near Mother's eye that subsequently required nine stitches. Father also broke a glass turtle tank causing broken glass and water to fall on R.S.M. as she lay in her bassinet. Mother picked up R.S.M. and stood in between Father and L.D.M. to protect Children as R.S.M. screamed. Mother was able to retrieve the knife and pry the door open. Father left the scene. Upon trying to drive to obtain medical care, Mother discovered that Father had punched out a taillight on her car and smashed the window on his own vehicle. Mother's friend called an ambulance, and Mother received medical treatment.

Immediately after the incident, Mother obtained a temporary PFA order and, on April 25, 2023, obtained a final PFA order against Father on behalf of herself and Children. The PFA order awarded Mother sole legal and physical

custody of Children and ordered that Father shall have no visitation rights. Notably, the PFA order stated, "the custody provisions of this order . . . are temporary. Either party may initiate custody proceedings pursuant to the custody statute at 23 Pa.C.S. §§ 5321-5340. Any valid custody order entered after the final protection from abuse order supersedes the custody provisions of this order." PFA Order, 4/23/23. The PFA order expires on April 26, 2026. Following the incident, L.D.M. experienced sleep regression for approximately one year and exhibited aggressive behavior, including hitting Mother.

On the night of the incident, police arrested Father, who ultimately pled guilty to Simple Assault and Endangering the Welfare of Children and received a sentence of 11½ to 23 months' incarceration. Father remained incarcerated from April 2023 until December 2023, when the country granted him parole. While on parole, police arrested Father for Driving Under the Influence as a third offense as well as Driving Under Suspension. Father pled guilty to both charges, and the court sentenced him to 1½ to 10 years' incarceration in a state facility. Father completed the Pennsylvania state boot camp program, became eligible for early release, and was granted parole on April 30, 2025. Father will remain on parole until 2033.

In April 2025, Mother married K.H. ("Stepfather"). Mother and Stepfather live together with Stepfather's three biological children, ages 9, 6, and 5, for whom he has 50/50 custody. Mother is employed full-time at AMP Building Materials, and Stepfather is self-employed and owns his own trucking company.

On April 24, 2025, Mother filed petitions for involuntary termination of Father's parental rights to Children. On the same day, Stepfather filed petitions for adoption of Children. The trial court appointed legal counsel for Children and subsequently held a hearing on August 25, 2025.

During the hearing, the court heard testimony from Mother, Stepfather, and Father. Mother and Stepfather testified in accordance with the above-stated facts. Additionally, Mother testified that her relationship with Father was "toxic" and filled with lies and abuse. N.T. Hearing, 8/25/2025, at 25. She explained that while they were together, Father would usually drink beer on the way home from work and then continue to drink beer and smoke marijuana all night. She testified, "if he ever drank liquor he got abusive." *Id.* at 19. Mother described an incident prior to obtaining the PFA order when she and Father were at his parent's house. Mother explained that she would not let Father drive his car because his license was suspended, and, in response, he punched her in the face. Mother testified that Father's parents did not do anything. Mother described another occasion where she and Father were in bed and Father punched one of the fish tanks, causing shattered glass, in front of Children. Mother testified that, prior to their separation, she was the primary caretaker for Children. Mother explained that Father would not engage with Children and would be "annoyed" if they got near him. *Id.* at 18.

Mother testified that Children do not ask about Father and do not know who Father is. She stated that Children call Stepfather "daddy" and look to him as their father figure. *Id.* at 16. She also testified that Children love

- 4 -

their stepsiblings and they get along like "brother and sister." *Id.* at 27. Mother testified that Stepfather treats all the children the same. She testified that adoption by Stepfather is in Children's best interest because "it's obvious he loves and supports them. He's always there for them. He's a hard worker. He provides. He loves and cares for them. And the kids lighten up every time he comes home. And it's heartwarming honestly. It's like a whole 360 my life did." *Id.* at 28.

Stepfather testified that he loves Children and wishes to adopt them. He stated that he has a cordial relationship with his ex-wife, and they have agreed on child support and custody without getting the court system involved. Stepfather testified that he cooks, cleans, fixes stuff around the house, helps transport Children to daycare, and helps with bath and bedtime for Children. Stepfather confirmed that he does not have a criminal record and has never been involved in PFA proceedings. Stepfather acknowledged that he had been involved with Children and Youth Services ("CYS") on one occasion when his then-three-year-old son informed daycare workers that Stepfather disciplined him by spanking his buttocks. Stepfather testified that he explained to CYS that he hit the child's behind with a pair of socks and CYS closed out the case without further investigation.[1]

---

[1] The trial court found Stepfather's testimony to be credible and found "this testimony was corroborated by CYS records, as confirmed by documentation from the CYS solicitors[.]" Trial Ct. Op., 12/18/25, at 5.

Father testified regarding the April 2023 incident and denied being the aggressor. He stated that he and Mother were both intoxicated and fighting over the Children's bedtime. He stated that they both knocked reptile tanks over and that Mother's cut occurred while he was trying to defend himself. He further testified that, prior to the incident in April 2023, he had a "wonderful" relationship with Children and that he would "play with them, change diapers, take care of them in the evenings to give [Mother] a break." *Id.* at 54.

Father testified that while he was incarcerated, he completed parenting classes, a domestic violence program, GED classes, and OSHA certification. He stated that he also attended Alcoholics Anonymous meetings. Father testified that he did not attempt to contact Children while he was incarcerated because of the PFA. Father explained that when he was released from prison from December 2023 to February 2024, he contacted MidPenn Legal services to assist with trying to see Children, but he was denied representation because they had previously represented Mother, which posed a conflict. Father confirmed that MidPenn Legal Services referred him to the Adams County Referral Network for attorneys, but he failed to follow through. He stated that he did not know he could proceed *pro se* or request filing fees to be waived. Father explained that he had access to the law library in prison but never signed up to utilize that resource.

Father testified that he was currently unemployed, and he believed he would need approximately six months before he could obtain employment, hire an attorney, and pursue custody modification. He further testified that

he had been sober since his most recent release from prison and has been attending counseling services. Father explained that he did not believe that termination of parental rights was in Children's best interest. He testified: "I'm their father. I know what is best for them. I'm not saying that [Mother and Stepfather are] not, but I believe that they should have both parents in their lives. I am working to better myself for not only myself but for them. I feel like it would be in their best interest to know their father, know that they have unconditional love from me and my family as well." *Id.* at 65.

On October 29, 2025, the court issued orders terminating Father's parental rights to Children pursuant to 23 Pa.C.S. §§ 2511(a)(1), (2) and (b).

Father timely appealed. Both Father and the trial court complied with Pa.R.A.P. 1925.

Father raises the following issues on appeal:

1. Did the court err and/or abuse its discretion in its decision to terminate the parental rights of A.C.M. because the evidence did not support grounds for said termination pursuant to 23 Pa.C.S. § 2511(a)(1)?

2. Did the court err and/or abuse its discretion in its decision to terminate the parental rights of A.C.M. because the evidence did not support grounds for said termination pursuant to 23 Pa.C.S. § 2511(a)(2)?

3. Did the court err and/or abuse its discretion in its decision to terminate the parental rights of A.C.M. because the evidence did not support a finding that said termination best serves the needs and welfare of the child[ren] at issue pursuant to 23 Pa.C.S. §2511(b)?

Father's Br. at 11.

In cases involving the involuntary termination of parental rights, this Court's review "is limited to determining whether the trial court's determination is supported by competent evidence." ***In re Adoption of L.A.K.***, 265 A.3d 580, 591 (Pa. 2021). When we review a trial court's decision to grant or deny a petition to involuntarily terminate parental rights, we must accept the trial court's findings of fact and credibility determinations if the record supports them. ***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." ***Id.*** (citation omitted). "Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand." ***In re R.N.J.***, 985 A.2d 273, 276 (Pa. Super. 2009) (citation omitted). We may not reverse merely because the record could support a different result. ***T.S.M.***, 71 A.3d at 267. We give great deference to the trial courts "that often have first-hand observations of the parties spanning multiple hearings." ***Id.*** Moreover, "[t]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." ***In re M.G.***, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted).

It is axiomatic that "[p]arents enjoy a fundamental right to make decisions regarding the care, custody[,] and control of their children. It cannot be denied that significant and permanent consequences for both the parent and child can follow the termination of parental rights, as there is an

undeniable importance in a child's relationship with a biological parent." **L.A.K.**, 265 A.3d at 591 (internal citations omitted). Accordingly, "[i]n recognition of the gravity attendant to the termination of parental rights, the moving party must establish the statutory grounds by clear and convincing evidence; that is, evidence that is so clear, direct, weighty and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." **Id.** at 592 (citations and quotation marks omitted).

Section 2511 of the Adoption Act, 23 Pa.C.S. § 2511, governs termination of parental rights, and requires a bifurcated analysis. "Initially, the focus is on the conduct of the parent." **In re Adoption of A.C.**, 162 A.3d 1123, 1128 (Pa. Super. 2017) (citation omitted). "The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a)." **Id.** (citation omitted). "[I]f the court determines that the parent's conduct warrants termination of his or her parental rights[,]" the court then engages in "the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child." **Id.** (citation omitted).

Notably, we need only agree with the court's decision as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm the termination of parental rights. **In re K.Z.S.**, 946 A.2d 753, 758 (Pa. Super. 2008). We concentrate our analysis on subsection 2511(a)(1).

Section 2511(a)(1) provides that the trial court may terminate parental rights if the petitioner establishes that "[t]he parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties."  23 Pa.C.S. § 2511(a)(1).  Although the statute focuses on an analysis of the six months immediately preceding the filing of the petition, the court must consider the whole history of a given case and may consider a parent's inaction before the six-month statutory provision.  *K.Z.S.*, 946 A.2d at 758.  Our Supreme Court has repeatedly defined "parental duties" in general as the affirmative obligation to provide consistently for the physical and emotional needs of a child:

> Parental duties are not defined in the Adoption Act, but our courts long have interpreted parental duties in relation to the needs of a child, such as love, protection, guidance and support.  Parental duties are carried out through affirmative actions that develop and maintain the parent-child relationship. The roster of such positive actions undoubtedly includes communication and association.  The performance of parental duties requires that a parent exert himself to take and maintain a place of importance in the child's life.  Fortitude is required, as a parent must act with reasonable firmness to overcome obstacles that stand in the way of preserving a parent-child relationship and may not wait for a more suitable time to perform parental responsibilities.

*L.A.K.*, 265 A.3d at 592 (internal citations and quotation marks omitted).

It is well-settled that "a parent's efforts are always considered in light of existing circumstances*."  Id.* (citations and internal quotation marks omitted).  "To that end, even where the evidence clearly establishes [that] a

parent has failed to perform affirmative parental duties for a period in excess of six months as required by Section 2511(a)(1), the court must examine the individual circumstances and any explanation offered by the parent to determine if that evidence, in light of the totality of circumstances, clearly warrants permitting the involuntary termination of parental rights." *Id.* at 593 (citations and internal quotation marks omitted).

> Our Supreme Court has explained:
>
> Consideration of the totality of the circumstances includes evaluation of the following: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between the parent and child, if any, including any efforts made by the parent to reestablish contact with the child; and (3) the effect that termination of parental rights would have on the child pursuant to Section 2511(b). . . . It is within this framework that a court determines whether a parent has faced barriers that prevented the parent from maintaining the parent-child relationship. What constitutes a "barrier" in the context of a Section 2511(a)(1) analysis is a finding within the discretion of the trial court, and what may constitute a barrier necessarily will vary with the circumstances of each case.

*Id.* Notably, "a parent's efforts to enforce his or her legal custody rights unquestionably establishes the affirmative performance of a positive parental duty[.]" *Id.* at 594. Finally, "[w]ith respect to any petition filed pursuant to subsection (a)(1) . . . the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S. § 2511(b).

In his first issue, Father avers that the "combination of the protection from abuse order, his incarceration, his lack of representation, and his lack of

legal knowledge made it impossible for him to have contact with [] Children." Father's Br. at 19. Father argues that the only thing he was able to do was comply with the PFA order and speculates that "attempts to defeat the restrictions set forth in the protection order during his incarceration would have been hopeless." *Id.* Finally, Father avers that he wishes to seek custody of Children now that he is no longer incarcerated. *Id.* Father essentially raises challenges to the weight of the evidence but, as discussed below, the trial court remained unpersuaded by Father's excuses.

It is undisputed that Father did not have contact with Children in the six months preceding the filing of the termination petition. The trial court also found that Father failed to file a custody action, secure counsel, send cards to Children, offer financial assistance to Children, or perform parental duties for Children. Trial Ct. Op., 12/18/25, at 9. The court acknowledged that the PFA order and Father's incarcerations caused "obvious obstacles" for Father but concluded that "Father did next to nothing to overcome these obstacles." *Id.*

The court found that Father was aware that the custody provisions in the PFA order could be modified, as evidenced by his attempt to elicit assistance from MidPenn Legal Services and the language of the order, which "explicitly provided that the custody provisions thereof were *temporary* and that either party could initiate custody proceedings, which would supersede the order." *Id.* The court placed great weight on the fact that "Father declined MidPenn's offer to connect him with an attorney referral board and conceded that he never exerted himself to do so much as Google search or visit the

prison law library to investigate how he could file a custody suit or find forms readily available online, at any time, while in or out of prison." *Id.*

After considering Father's efforts, or lack thereof, the court found that Father failed to act with reasonable firmness to overcome obstacles that he, himself, created. The court opined:

> This was a case of Father facing obstacles and doing little to overcome them or give much thought to how that might be done outside of waiting for some more convenient time in the indeterminate future. Father did not act with reasonable firmness to overcome barriers to fulfilling his parental obligations. We must also note that the PFA and Father's incarceration were not obstacles "placed" in front of Father or things that happened to him. These were circumstances of his creation that followed, *inter alia*, Father shattering a turtle tank over the infant R.S.M. as she slept in her bassinet, scaring L.D.M. and creating months of sleeplessness for him, and cutting Mother's face open with a knife. Overcoming the PFA was the least of the work Father had yet to do to re-establish himself as a parent who supports and protects his children, emotionally and physically.

*Id.* at 10. The court emphasized that at the time of the termination hearing, Children had not seen Father in almost two years and concluded that it was in Children's best interest to terminate Father's parental rights, acknowledging that "[t]he effect of termination on the children under these circumstances was the removal of a legal title only." *Id.* at 10-11.

The court summarized its decision as follows:

> Upon consideration of Father's failure to perform parental duties in the six months preceding the filing of the petitions (which is merely a sample of a much longer period of the same that preceded it), the obstacles that Father's violence created for his ability to maintain contact and a relationship with the children, Father's explanations for his failure to overcome such obstacles, Father's ultimate failure to exert himself to regain contact with the

- 13 -

children and maintain a place of importance in their lives, lack of post-abandonment contact, and the effect of termination on the children, we found Section 2511(a)(1) satisfied.

*Id.* at 11.

Upon review, the record supports the trial court's findings. We decline to usurp the court's credibility determinations or reweigh the evidence. Therefore, we find no abuse of discretion in the trial court's termination of Father's parental rights pursuant to Section 2511(a)(1).

\* \* \*

With respect to Section 2511(b), our Supreme Court has recently explained that the "primary consideration must be the child's developmental, physical and emotional needs and welfare." *Interest of K.T.*, 296 A.3d 1085, 1105 (Pa. 2023) (citing 23 Pa.C.S. § 2511(b); internal quotation marks omitted). "Notably, courts should consider the matter from the child's perspective, placing [his or] her developmental, physical, and emotional needs and welfare above concerns for the parent." *Id.* This determination must be made on a case-by-case basis with the court considering each child's specific needs. *Id.* at 1105-1106. Our Supreme Court has interpreted the "emotional needs and welfare of the child . . . to include intangibles such as love, comfort, security, and stability." *T.S.M.*, 71 A.3d at 267 (citation and internal quotation marks omitted). "One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child

of permanently severing any such bond." ***In re Adoption of N.N.H.***, 197 A.3d 777, 783 (Pa Super. 2018) (citation omitted). The fact that a child has a bond with a parent "does not preclude the termination of parental rights." ***In re A.D.***, 93 A.3d 888, 897 (Pa. Super. 2014). Rather, the trial court must examine the depth of the bond to determine whether the bond is so meaningful to the child that its termination "would destroy an existing, necessary, and beneficial relationship." ***Id.*** at 898 (citation omitted). In other words, "[c]ourts must determine whether the trauma caused by breaking that bond is outweighed by the benefit of moving the child toward a permanent home." ***T.S.M.***, 71 A.3d at 253. "Moreover, by evaluating the impact of severance to determine if it will impose more than an adverse or detrimental impact, courts correctly refine their focus on the child's development and mental and emotional health rather than considering only the child's 'feelings' or 'affection' for the parent, which even badly abused and neglected children will retain." ***K.T.***, 296 A.3d at 1110–11. "Therefore, to grant termination when a parental bond exists, there must be clear and convincing evidence that the bond is not necessary and beneficial." ***Id.*** at 1114.

Father avers that the trial court abused its discretion when it terminated his parental rights pursuant to Section 2511(b). Father argues that the trial court failed to consider the duration of the "untested" relationship between Mother and Stepfather, who is the prospective adoptive parent, as well as the fact that Stepfather "had recently ended a previous marriage that lasted a

minimal duration of time." Father's Br. at 20. Father further argues that he is "on the comeback" and Children would have the "best of both worlds" to have both him and a "doting stepfather" in their lives. *Id.* at 20. While we understand Father's heartfelt argument, it fails to convince us that the court abused its discretion in terminating his parental rights.

Here, the trial court properly considered the Children's developmental, physical, and emotional needs and welfare, placing great weight on the fact that Children are very young, have not seen Father for almost two years, and, therefore, have no bond with Father. Trial Ct. Op. at 13. The court also emphasized that the last time that Children saw Father necessitated a PFA order, and that Father has done nothing to repair his relationship with Children over the past two years. *Id.* at 13. The court opined:

> All information available to this Court of the history of Father's involvement, and lack thereof, proved that the children's security, safety, and stability cannot depend on Father. We therefore found by clear and convincing evidence that termination would not sever a bond, much less a necessary and beneficial bond.

*Id.*

The court also considered the bond that Children have with Mother and Stepfather, whom they call "daddy," to conclude that Children are "loved and secure and stable, together with their [stepsiblings], who love each other as a biological family." *Id.* at 14. The court further found that Children "are incredibly young and do not know a father outside of Stepfather. Their bond with Mother and Stepfather is the only parental bond they have, and an important, secure, and loving bond at that." *Id.* at 14.

Father provides no case law to support his assertion that the court should consider the length or nature of Stepfather's romantic relationships. As discussed above, the court properly focused on Children's relationship with Stepfather and his role in their life.

The trial court credited Mother and Stepfather's testimony regarding their bond with Children and found, based on the undisputed facts that Children are young and have not seen Father in approximately two years and that Children do not have a bond with Father. The court concluded that termination of Father's parental rights is in Children's best interest, and the record supports the trial court's findings. We discern no abuse of discretion.

* * *

In conclusion, our review of the record supports the trial court's findings. We discern no error of law or abuse of discretion with respect to the trial court's conclusion that the Agency presented clear and convincing evidence to terminate Father's parental rights pursuant to Section 2511(a)(1) and (b). In light of our disposition, we decline to address Father's arguments as they relate to other subsections of Section 2511.

Orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: <u>04/15/2026</u>